**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**WP COMPANY LLC
d/b/a THE WASHINGTON POST, et al.**,

Plaintiffs,

v.

**U.S. SMALL BUSINESS ADMINISTRATION**,

Defendant.

Case No. 1:20-cv-1240-JEB

Oral Argument Requested

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Kristel Tupja (#888324914)
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
tupjak@ballardspahr.com

*Counsel for Plaintiffs*

Dated:  September 8, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ........................................................... 2

I.      The COVID-19 Pandemic ....................................................................................... 2

II.     The Paycheck Protection Program And Economic Injury Disaster
        Loan Program .......................................................................................................... 3

III.    Questions Surrounding The SBA's COVID Relief Programs ................................. 5

        A.      Concerns Over Effectiveness And Equity ................................................. 5

        B.      Concerns Over Integrity ............................................................................. 7

IV.     Plaintiffs' FOIA Requests And The SBA's Responses .......................................... 8

V.      This Lawsuit and SBA's Subsequent Partial Disclosures ...................................... 9

ARGUMENT ...................................................................................................................... 12

I.      STANDARD OF REVIEW .................................................................................... 12

II.     FOIA CLEARLY REQUIRES THE SBA TO RELEASE THE LOAN DATA ............... 12

        A.      The SBA Has Not Justified Withholding Loan Data Under
                Exemption 4 .............................................................................................. 13

                1.      The Loan Data does not reveal information customarily or
                        actually treated as private ............................................................. 15

                2.      The Loan Data was provided under an assurance of *disclosure* ............... 17

        B.      The SBA Has Not Justified Withholding Loan Data Under
                Exemption 6 .............................................................................................. 19

                1.      Any privacy interest in the Loan Data is minimal at most ........................ 20

                2.      The enormous public interest in the Loan Data requires
                        its disclosure .................................................................................. 23

        C.      The SBA Has Not Satisfied FOIA's New Foreseeable Harm Standard ............... 28

CONCLUSION .................................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*ACLU v. Dep't of Justice,*
655 F.3d 1 (D.C. Cir. 2011) .......................................................................................20

*Alliance for the Wild Rockies v. Dep't of the Interior,*
53 F. Supp. 2d 32 (D.D.C. 1999) ................................................................................21

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review,*
830 F.3d 667 (D.C. Cir. 2016) ....................................................................................20

*Amadis v. Dep't of State,*
No. 19-5088, 2020 U.S. App. LEXIS 26633 (D.C. Cir. Aug. 21, 2020) ....................28

*Bartko v. Dep't of Justice,*
898 F.3d 51 (D.C. Cir. 2018) ......................................................................................12

*Buffalo Evening News, Inc. v. SBA,*
666 F. Supp. 467 (W.D.N.Y. 1987) ............................................................................25

*CREW v. FEC,*
711 F.3d 180 (D.C. Cir. 2013) ......................................................................................9

*Ctr. for Investigative Reporting v. Customs & Border Prot.,*
436 F. Supp. 3d 90 (D.D.C. 2019) ..............................................................................14

*Dep't of Air Force v. Rose,*
425 U.S. 352 (1976) ..............................................................................................12, 28

*Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
489 U.S. 749 (1989) ....................................................................................................26

*\*Food Mktg. Inst. v. Argus Leader Media,*
139 S. Ct. 2356 (2019) ........................................................................................ *passim*

*Gozlon-Peretz v. United States,*
498 U.S. 395 (1991) ....................................................................................................18

*Judicial Watch, Inc. v. Dep't of Commerce,*
375 F. Supp. 3d 93 (D.D.C. 2019) ........................................................................28, 29

*Larson v. Dep't of State,*
565 F.3d 857 (D.C. Cir. 2009) ....................................................................................12

*\*Multi AG Media LLC v. Dep't of Agriculture,*
515 F.3d 1224 (D.C. Cir. 2008) ............................................................................23, 24

*Nat'l Parks & Conservation Ass'n v. Morton*,
  498 F.2d 765 (D.C. Cir. 1974) ...................................................................................13, 14

*News-Press v. Dep't of Homeland Sec.*,
  489 F.3d 1173 (11th Cir. 2007) .............................................................................................24

*Prechtel v. FCC*,
  330 F. Supp. 3d 320 (D.D.C. 2018) ................................................................................21, 22

*Pub. Citizen, Inc. v. OMB*,
  598 F.3d 865 (D.C. Cir. 2010) ..............................................................................................12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ................................................................................................................18

*Rosenberg v. Dep't of Def.*,
  442 F. Supp. 3d 240 (D.D.C. 2020) .......................................................................................29

*Washington Post Co. v. Dep't of Agriculture*,
  943 F. Supp. 31 (D.D.C. 1996) ..............................................................................22, 24, 25

**Statutes & Other Authorities**

Coronavirus Aid, Relief, and Economic Security Act, Pub. Law No. 116-136 ......................4, 24

Federal Funding Accountability and Transparency Act of 2006,
  31 U.S.C. § 6101 note ............................................................................................................19

Freedom of Information Act, 5 U.S.C. § 552 ................................................................. *passim*

Interim Final Rule, Business Loan Program Temporary Changes, Paycheck
  Protection Program, 85 Fed. Reg. 20,811 (Apr. 15, 2020) .....................................................16

## PRELIMINARY STATEMENT

Plaintiffs, 11 national news organizations, brought this Freedom of Information Act ("FOIA") lawsuit against Defendant the U.S. Small Business Administration (the "SBA") to further the public's understanding of the government's unprecedented use of public funds to support private businesses affected by the COVID-19 pandemic.  Specifically, the SBA has refused to disclose the identities of, and amounts borrowed by, the businesses that collectively received more than half a trillion taxpayer dollars through the SBA's new Paycheck Protection Program ("PPP") and its existing Economic Impact Disaster Loan ("EIDL") program.  The SBA's objections to disclosure are baseless, and the Court should order the agency to release this information pursuant to FOIA.

First, the SBA repeatedly asserts that releasing the names and addresses of the borrowers and the amounts they borrowed (together, the "Loan Data") would reveal sensitive financial information shielded from disclosure by FOIA Exemption 4, but the amount that a borrower receives under these loan programs does not reliably reveal anything confidential about its finances.  Moreover, the SBA expressly notified the applicants for these loans that the agency would disclose borrowers' names and the amounts they borrowed, and the Federal Funding Accountability and Transparency Act of 2006 generally requires the government to publish such loan information regardless of whether it is the subject of a FOIA request.  The SBA therefore cannot justify withholding the Loan Data as "confidential" information under Exemption 4.

Second, the SBA argues that releasing the Loan Data would constitute a "clearly unwarranted invasion of personal privacy" within the scope of FOIA Exemption 6, but the D.C. Circuit has squarely held that, in these precise circumstances, FOIA demands transparency rather than concealment.  The privacy interest in the Loan Data is minimal at most, while releasing the

1

Loan Data would advance the surpassing public interest in monitoring this extraordinary outlay of federal funds and evaluating whether the SBA has implemented these relief efforts effectively and equitably.  The Exemption 6 balancing test thus weighs decisively in favor of disclosure.

Third, the SBA cannot carry the increased burden imposed on federal agencies to justify nondisclosure following the FOIA Improvement Act of 2016.  The SBA now must do more than argue that releasing the Loan Data merely could cause harm to the interests protected by Exemptions 4 and 6 – it must demonstrate that such harm is a reasonably foreseeable consequence of disclosure.  The SBA does not even mention this requirement, let alone satisfy it.

For these reasons and as set forth below, the Court should deny the SBA's motion for summary judgment, grant Plaintiffs' cross-motion for summary judgment, order the SBA to release the Loan Data, and allow Plaintiffs to recover the expenses of litigating this FOIA suit.

## BACKGROUND AND PROCEDURAL HISTORY

### I.     The COVID-19 Pandemic

On January 31, 2020, the U.S. government declared a public health emergency regarding the novel coronavirus SARS-CoV-2, which causes the disease COVID-19.  Dep't of Health & Human Servs., *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus*, Jan. 31, 2020, https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.  To date, COVID-19 is believed to have infected at least 6,301,649 people and killed 189,226 people in the United States alone.  *See* Johns Hopkins Univ. & Med., *Coronavirus Resource Center: Global Map*, https://coronavirus.jhu.edu/map.html.[1]

---

[1] At the time Plaintiffs filed their original Complaint in this action, on May 12, 2020, those figures were 1,354,504 people infected and 81,076 people killed.  *See* Compl. (Dkt. 1) ¶ 13.

2

This public health emergency has caused an economic crisis.  Perhaps the starkest indicator of COVID's economic impact is that in April 2020 U.S. unemployment reached 14.7 percent, its highest level since the Great Depression.  *See, e.g.*, Heather Long & Andrew Van Dam, *U.S. unemployment rate soars to 14.7 percent, the worst since the Depression era*, The Washington Post, May 8, 2020, https://www.washingtonpost.com/business/2020/05/08/april-2020-jobs-report/.[2]  As of the date of this filing, the U.S. unemployment rate sits at 8.4 percent. *See* U.S. Bureau of Labor Statistics, *Employment Situation Summary*, Sept. 4, 2020, https://www.bls.gov/bls/newsrels.htm.

Jobs numbers alone, however, do not tell the whole story of this crisis.  Analyzing data collected by the U.S. Census Bureau, the non-partisan Center on Budget and Policy Priorities reported that, for the week ending July 21, 2020, "[a]bout 29 million adults . . . reported that their household sometimes or often didn't have enough to eat in the last seven days. . . .  And 11 to 20 percent of adults with children reported that their children sometimes or often didn't eat enough in the last seven days because they couldn't afford it, well above the pre-pandemic figure.  This translates into an estimated 9 to 17 million children who live in a household in which the children were not eating enough because the household couldn't afford it."  *See* Ctr. on Budget & Policy Priorities, *Tracking the COVID-19 Recession's Effects on Food, Housing, and Employment Hardships*, Sept. 4, 2020, https://www.cbpp.org/research/poverty-and-inequality/tracking-the-covid-19-recessions-effects-on-food-housing-and.

## II.    The Paycheck Protection Program And Economic Injury Disaster Loan Program

In March 2020, the federal government escalated its efforts to address the economic crisis

---

[2] For the Court's convenience, copies of news reports cited in this Memorandum are attached as exhibits to the Declaration of Charles D. Tobin ("Tobin Decl.").

caused by the pandemic by passing into law the Coronavirus Aid, Relief, and Economic Security

("CARES") Act.  *See* Pub. Law No. 116-136.  The centerpiece of the CARES Act was the

creation of the PPP, which amends Section 7(a) of the Small Business Act.  *Id.* § 1102(a).

According to the Treasury Department, the PPP "is implemented by the [SBA] with support

from the Department of the Treasury," and it "provides small businesses with funds to pay up to

8 weeks of payroll costs including benefits," as well as "interest on mortgages, rent, and

utilities."  *See* U.S. Dep't of the Treasury, *The CARES Act Provides Assistance to Small*

*Businesses*, https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses.  The

SBA also announced it would lend up to $2 million to small businesses affected by COVID-19

under the agency's EIDL program.  *See* SBA, *SBA to Provide Disaster Assistance Loans for*

*Small Businesses Impacted by Coronavirus (COVID-19)*, Mar. 16, 2020,

https://www.sba.gov/about-sba/sba-newsroom/press-releases-media-advisories/sba-provide-

disaster-assistance-loans-small-businesses-impacted-coronavirus-covid-19.

      The centerpiece of the PPP, in turn, is loan forgiveness.  The SBA continues to clarify

under what conditions it will forgive PPP loans, but recently it represented that loans "will be

fully forgiven if the funds are used for payroll costs, interest on mortgages, rent, and utilities,"

and in particular that "due to likely high subscription, at least 60% of the forgiven amount must

have been used for payroll."  SBA, *Paycheck Protection Program*, https://www.sba.gov/funding-

programs/loans/coronavirus-relief-options/paycheck-protection-program.

      As of August 8, 2020, the SBA reports having approved $525,012,201,124 in loans under

the PPP.  *See* SBA, *Paycheck Protection Program (PPP) Report: Approvals through Aug. 8,*

*2020*, https://www.sba.gov/sites/default/files/2020-08/PPP_Report%20-%202020-08-10-508.pdf

at 2.  As of August 24, 2020, the SBA reports having approved $188,022,021,024 in COVID-

related loans under the EIDL program.  *See* SBA, *Disaster Assistance Update: Nationwide EIDL Loans*, Aug. 24, 2020, https://www.sba.gov/sites/default/files/2020-08/EIDL%20COVID-19%20Loan%208.24.20-508.pdf at 2.  Together, this $713 billion is more than the government spent on Medicaid in Fiscal Year 2018, *see* Ctrs. for Medicare & Medicaid Servs., *NHE Fact Sheet*, Mar. 14, 2020, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet ($597.4 billion), and more than the President has requested for the Department of Defense's entire Fiscal Year 2021 budget, *see* Dep't of Def., *DoD Budget Request*, https://comptroller.defense.gov/Budget-Materials/ ($705.4 billion).

III.    **Questions Surrounding The SBA's COVID Relief Programs**

Concerns about the PPP and EIDL quickly arose among the public and elected officials alike, including over whether these programs were making loans available to the borrowers who needed them most and whether the integrity of the programs was being monitored with due care.

A.    **Concerns Over Effectiveness And Equity**

Though the SBA initially refused to disclose which companies received assistance, press reports identified seemingly well capitalized public companies among the PPP loan recipients, even as "many small firms didn't receive money in the initial [round of] funding."  *See, e.g.*, Inti Pacheco & Theo Francis, *Public Companies Got $500 Million in Small Business Loans*, The Wall Street Journal, Apr. 22, 2020, https://www.wsj.com/articles/these-are-the-public-companies-that-got-small-business-loans-11587493742.  Some of these PPP borrowers decided to return the SBA's loans in the face of such public scrutiny.  For example, Shake Shack, a $1.6 billion burger-and-fries chain, received $10 million under the PPP, but the company later decided to return the loan, writing in an open letter, "If this act were written for small businesses,

how is it possible that so many independent restaurants whose employees needed just as much help were unable to receive funding?"  *See* Jonathan O'Connell, *White House, GOP face heat after hotel and restaurant chains helped run small business program dry*, The Washington Post, Apr. 20, 2020, https://www.washingtonpost.com/business/2020/04/20/white-house-gop-face-heat-after-hotel-restaurant-chains-helped-run-small-business-program-dry/.[3]  On May 8, 2020, the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis sent letters to several PPP borrowers "demanding that [these] large, public corporations immediately return taxpayer funds that Congress intended for small businesses struggling to survive during the coronavirus crisis."  *See* House Comm. on Oversight & Reform, *In First Official Action, House Coronavirus Panel Demands That Large Public Corporations Return Taxpayer Funds Intended for Small Businesses*, May 8, 2020, https://oversight.house.gov/news/press-releases/in-first-official-action-house-coronavirus-panel-demands-that-large-public.

The press and public have further questioned whether businesses that were unable to secure PPP loans were hindered in their attempts by race or geography.  *See, e.g.,* Ben Popken, *Why are so many black-owned small businesses shut out of PPP loans?*, NBC News, Apr. 29, 2020, https://www.nbcnews.com/business/business-news/why-are-so-many-black-owned-small-businesses-shut-out-n1195291; Aaron Glantz, *Bailout money bypasses hard-hit New York, California for North Dakota, Nebraska*, Reveal, Apr. 23, 2020,

---

[3] Other businesses that announced they would return PPP loans include Ruth's Chris Steak House and the Los Angeles Lakers.  *See* Greg Farrell, *JPMorgan's Publicly Traded Clients Give Back the Most PPP Loans*, Bloomberg, May 8, 2020, https://www.bloomberg.com/news/articles/2020-05-08/jpmorgan-s-publicly-traded-clients-give-back-the-most-ppp-loans.  Ashford Inc., which owns hotels and resorts, announced it would return PPP funds after its subsidiaries received more than $70 million.  *See* Jeanna Smialek, *Hotel Group Will Return Tens of Millions in Small Business Loans*, The New York Times, May 5, 2020, https://www.nytimes.com/2020/05/02/business/economy/ashford-hotels-virus-monty-bennett.html/.

https://www.revealnews.org/article/bailout-money-bypasses-hard-hit-new-york-california-for-north-dakota-nebraska/.  Amplifying those concerns, the SBA's Office of Inspector General issued a "Flash Report" on the agency's implementation of the PPP, finding several "areas . . . that did not fully align with the [CARES] Act's provisions," including that the "SBA did not provide guidance to lenders about prioritizing borrowers in underserved and rural markets," such that "these borrowers, including rural, minority and women-owned businesses may not have received the loans as intended."  *See* SBA Inspector Gen., *Flash Report: Small Business Administration's Implementation of the Paycheck Protection Program's Requirements*, May 8, 2020, https://www.sba.gov/sites/default/files/2020-05/SBA_OIG_Report_20-14_508.pdf at 4.

### B.    Concerns Over Integrity

Alarm also began growing as to whether these programs were subject to sufficiently careful monitoring to protect taxpayer funds from fraud and abuse.  *See, e.g.*, Tom Schoenberg & Christian Berthelsen, *Justice Department Sees Early Fraud Signs in SBA Loan Flurry*, Bloomberg, Apr. 30, 2020, https://www.bloomberg.com/news/articles/2020-04-30/justice-department-sees-early-fraud-signs-in-sba-loan-flurry (quoting U.S. Assistant Attorney General Brian Benczkowski's observation that "Whenever there's a trillion dollars out on the street that quickly, the fraudsters are going to come out of the woodwork in an attempt to get access to that money.").  On May 5, 2020, the Department of Justice announced that "the first individuals in the nation" had been "charged with allegedly defrauding the CARES Act SBA Paycheck Protection Program."  *See* Dep't of Justice, *Two Charged in Rhode Island with Stimulus Fraud*, May 5, 2020, https://www.justice.gov/opa/pr/two-charged-rhode-island-stimulus-fraud.

To date, "[t]he Justice Department has made at least 41 criminal complaints in federal court against nearly 60 people, who collectively took $62 million from the Paycheck Protection

Program."  Stacy Cowley, *Spotting $62 Million in Alleged P.P.P. Fraud Was the Easy Part*, The New York Times, Aug. 28, 2020, https://www.nytimes.com/2020/08/28/business/ppp-small-business-fraud-coronavirus.html at 1.  SBA Inspector General Hannibal Ware characterized these prosecutions as "the smallest, tiniest piece of the tip of the iceberg," and indeed, the SBA's "fraud hotline, which received fewer than 800 calls last year, has already had 42,000 reports about coronavirus-linked graft."  *Id.* at 1, 2.

Members of Congress have voiced their concerns over the PPP's integrity as well. Representative Mary Gay Scanlon, for example, has asked the SBA to investigate whether Buca Restaurants Inc. received PPP funds in connection with a restaurant located in the Philadelphia suburbs that had been closed for seven years.  *See* Jacob Adelman, *Philly-area congresswoman seeks answers on bogus report of PPP loan to long-closed Buca di Beppo restaurant in Wynnewood*, The Philadelphia Inquirer, Aug. 13, 2020, https://www.inquirer.com/news/ppp-wynnewood-buca-di-beppo-scanlon-coronavirus-relief-loan-trump-mnuchin-20200813.html. Rep. Scanlon expressed to the SBA that "thorough oversight of the funds that have already been dispersed" will ensure that "future funds can be fairly and effectively distributed."  *Id.* at 1.

## IV.    Plaintiffs' FOIA Requests And The SBA's Responses

Throughout April and May 2020, the eleven Plaintiffs in this action – WP Company LLC d/b/a The Washington Post, Bloomberg L.P., Dow Jones & Company, Inc., Pro Publica, Inc., The New York Times Company, American Broadcasting Companies, Inc. d/b/a ABC News, American City Business Journals, Inc., Cable News Network, Inc., NBCUniversal Media, LLC d/b/a NBC News, The Associated Press, and The Center for Investigative Reporting d/b/a Reveal – submitted FOIA requests to the SBA for records that would identify and provide basic information about the businesses approved for public assistance under the SBA's COVID-related

programs, including the PPP and EIDL.  *See* Am. Compl., Exs. 1, 2, 5, 9, 12, 13, 14, 18, 20, 24,

27, 29, 31, 33, and 35.  Though there are slight variations among these requests, taken together

they seek essentially the same categories of information about the COVID-related loans that the

SBA has routinely provided about the loans made under its 7(a) program – the program that the

CARES Act expanded to create the PPP.  *See* SBA, *FOIA: Frequently requested records*,

https://www.sba.gov/about-sba/open-government/foia.

The SBA either failed to respond to these requests or it issued boilerplate responses

stating that, at some indefinite point "[i]n the future," the agency hoped "to turn [its] efforts to

providing loan specific data to the public."  *See, e.g.*, Am. Compl., Ex. 3.  These responses

provided no concrete indication of what the data would include or when the data would actually

be made available and thus constituted constructive denials of the Plaintiffs' FOIA requests.  *See*

*CREW v. FEC*, 711 F.3d 180, 188-89 (D.C. Cir. 2013).

**V.     This Lawsuit and SBA's Subsequent Partial Disclosures**

On May 12, 2020, five of the current Plaintiffs filed the initial Complaint in this matter.

*See generally* Compl. (Dkt. 1).  That Complaint asserted three counts against SBA under FOIA:

constructive denial of requests for agency records (Count I); denial of expedited processing

(Count II); and constructive denial of expedited processing (Count III).  *Id.*

On May 29, 2020, all 11 of the current plaintiffs filed the Amended Complaint in this

action.  *See generally* Am. Compl. (Dkt. 5).  The Amended Complaint asserted four counts under

FOIA: constructive denial of requests for agency records (Count I); constructive denial of

administrative appeal (Count II); denial of expedited processing (Count III); and constructive

denial of expedited processing (Count IV).  *Id.*  Plaintiffs sought an order compelling the SBA to

disclose all the same categories of information concerning its PPP and COVID-related EIDL

9

loans that the agency has historically released concerning loans made under its 7(a) program. *See id.* ¶ 41.

On June 12, 2020, the SBA filed its Answer to Plaintiffs' Amended Complaint.  Dkt. 9. In its Answer, the SBA asserted as an affirmative defense that "[s]ome or all of the requested documents and information are exempt from disclosure under FOIA."  *Id.* at 24.

On June 29, 2020, the Court ordered the SBA to "issue a final response" to all of Plaintiffs' FOIA requests at issue in this case and to "produce any responsive non-exempt records" by July 13, 2020.  Minute Order, June 29, 2020.  On July 6, 2020, the SBA publicly "announced [that] it was releasing detailed loan-level data regarding the loans made under the [PPP]," stating that "[t]his disclosure covers each of the 4.9 million PPP loans that have been made."  *See* SBA, *SBA and Treasury Announce Release of Paycheck Protection Program Loan Data*, July 13, 2020, https://www.sba.gov/about-sba/sba-newsroom/press-releases-media-advisories/sba-and-treasury-announce-release-paycheck-protection-program-loan-data.

The data that the SBA released, however, did not provide both dollar amounts and borrower names and addresses for <u>any</u> of these loans.  For loans under $150,000 the SBA withheld recipients' names and addresses, and for loans over $150,000 the SBA withheld the dollar amount of the loan and instead provided "loan amount ranges" of $150,000-$350,000; $350,000-$1 million; $1-$2 million; $2-$5 million; and $5-$10 million.  *Id.*  The data also did not reflect loans that borrowers quickly repaid, such as the $4.6 million loan that the Los Angeles Lakers took out under the PPP and returned following public scrutiny.  *See, e.g.*, Matt Bonesteel, *Lakers say they've repaid federal loan meant to help small businesses*, The Washington Post, Apr. 27, 2020, https://www.washingtonpost.com/sports/2020/04/27/lakers-say-theyve-repaid-

federal-loan-meant-help-small-businesses/.[4]

On July 13, 2020, the SBA notified Plaintiffs that the data released on July 6 represented all of the "responsive non-exempt records" that the SBA would produce with respect to the PPP. The SBA specifically asserted that "[p]ortions of the data" – *i.e.*, the names and addresses of recipients of loans under $150,000 and the dollar amounts of loans over $150,000 – "are being withheld pursuant to FOIA Exemptions 4 and 6."  *See, e.g.*, Dkt. 13-1 at 1 (SBA's July 13, 2020 letter to The Washington Post).  On July 20, 2020, the SBA "informed Plaintiffs that [the agency] was releasing the loan data for all [COVID-related] EIDL loans, except that the names and street addresses of sole proprietorships and independent contractors were being withheld pursuant to FOIA Exemption 6."  Manger Decl. ¶ 91.

On August 18, 2020, the SBA moved for summary judgment as to its withholdings. Dkt. 14.  In its Memorandum of Points and Authorities in Support of that Motion (the "SBA Brief"), the SBA argues that it may withhold under Exemption 4 the actual dollar amount of all PPP loans over $150,000, and that it may withhold under Exemption 6 the names and addresses of borrowers for all PPP loans under $150,000.  The SBA further asserts that it may withhold the names and addresses of sole proprietorships and independent contractors that received EIDL loans under Exemption 6.

Plaintiffs now oppose the SBA's motion for summary judgment and cross-move for summary judgment on the grounds that the SBA's withholdings are improper and that all of the Loan Data must be released pursuant to FOIA.

---

[4] The SBA now asserts that it "has no responsive records with regard to PPP loans that were approved but quickly repaid and then cancelled" or "loans that were approved but not borrowed."  Declaration of William Manger ("Manger Decl.") (Dkt. 14-1) ¶¶ 92-93.

## ARGUMENT

### I.     STANDARD OF REVIEW

A court may grant summary judgment to the government in FOIA litigation only if the government's filings "describe the justifications for nondisclosure with *reasonably specific* detail, demonstrate that the information withheld *logically* falls within the claimed exemption, and are *not controverted* by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphasis added and citation omitted).  Underlying this analysis is the principle that FOIA's objective is "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny,'" and that its exemptions should be "construed narrowly in keeping with FOIA's presumption in favor of disclosure." *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2010) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)).  The government thus "bears the burden of proving that an exemption applies." *Bartko v. Dep't of Justice*, 898 F.3d 51, 62 (D.C. Cir. 2018).

### II.     FOIA CLEARLY REQUIRES THE SBA TO RELEASE THE LOAN DATA

The SBA fails to justify withholding the Loan Data from the public.  For one, the SBA has not shown – and cannot show – that the Loan Data even falls within the scope of Exemption 4 or Exemption 6.  For another, the SBA has not carried its increased burden under the FOIA Improvement Act to show that the asserted harms of releasing the Loan Data are not just theoretically possible, but are reasonably foreseeable.  The Court should deny the SBA's motion for summary judgment, grant the Plaintiffs' cross-motion, and order the Loan Data to be released in full and without delay.

A.        **The SBA Has Not Justified Withholding Loan Data Under Exemption 4.**

The SBA seeks to withhold the Loan Data in part under Exemption 4, which allows an

agency to shield "commercial or financial information obtained from a person and privileged or

confidential."  5 U.S.C. § 552(b)(4).  SBA's Exemption 4 claim fails on its face.

For several decades, the D.C. Circuit held that "commercial or financial matter is

'confidential' for purposes of [Exemption 4] if disclosure of the information is likely . . . (1) to

impair the Government's ability to obtain necessary information in the future; or (2) to cause

substantial harm to the competitive position of the person from whom the information was

obtained."  *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).

Last year, however, the Supreme Court rejected this *National Parks* test as "a relic from a

bygone era of statutory construction."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356,

2364 (2019).  The Court instead grounded Exemption 4 in what it concluded was "the ordinary,

contemporary, common meaning [of the term 'confidential'] when Congress enacted FOIA in

1966."  *Id.* at 2362 (citation omitted).  The Court thus adopted a new two-prong test, which asks

whether the "commercial or financial information" at issue (1) is "both customarily and actually

treated as private by its owner"; and (2) was "provided to the government under an assurance of

privacy."  *Id.* at 2366.[5]

The Court clarified that the first condition <u>must</u> be met to pass the test, though it found

"no need to resolve" whether the second condition also is necessary – *i.e.*, the Court declined to

answer whether "privately held information [can] *lose* its confidential character for purposes

of Exemption 4 if it's communicated to the government without assurances that the government

---

[5] The *Argus Leader* test therefore requires, as a threshold matter, that the information at issue
must be "commercial or financial," but Plaintiffs do not dispute that the Loan Data so qualifies.

will keep it private." *Id.* at 2363 (emphasis in original); *see also Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90, 112 (D.D.C. 2019) ("By waiting until another day to determine whether and when this requirement applies, the Supreme Court left room to treat involuntarily submitted information and voluntarily submitted information differently from one another."). "At least" when both conditions are met, therefore, "the information is 'confidential' within the meaning of Exemption 4." *Argus Leader*, 139 S. Ct. at 2363.

The SBA argues that it can satisfy both prongs of the new Supreme Court Exemption 4 test. On the first prong, according to the SBA, a company's "average payroll" is confidential financial information, and an "average payroll can be deduced with reasonable confidence from the precise value of a PPP loan, and it could be attributed to any borrower whose identity was associated with the precise value of its loan." SBA Brief at 8. On the second prong, the SBA initially asks the Court to resolve the unanswered question of *Argus Leader* by holding that information can be confidential even if it was <u>not</u> provided to the government with an assurance of privacy. *Id.* at 9-11. The SBA then asks the Court in the alternative to find that it "gave at least an implied promise of confidentiality to borrowers." *Id.* at 16 (internal marks and citation omitted).[6]

The SBA errs on each of these points. First, the Loan Data would not reveal information about borrowers that has "customarily" and "actually" been treated as private, because the size of a PPP loan does not, in fact, reveal the borrower's average payroll. Second, the Court need not resolve the unanswered *Argus Leader* question. Whether or not an assurance of <u>privacy</u> is

---

[6] The SBA further argues that "competitors" might use the Loan Data against borrowers in a way that poses a "salient threat SBA sought to mitigate." SBA Brief at 17. The Court should reject out of hand this appeal to the now-abrogated "competitive harm" standard from *National Parks*.

needed to satisfy Exemption 4 – the unanswered question in *Argus Leader* – a business's decision to provide information <u>despite an assurance of disclosure</u> renders that information non-confidential as a matter of plain and ordinary meaning.

   **1.**  **The Loan Data does not reveal information customarily or actually treated as private.**

  The SBA's core argument for withholding the Loan Data is that "disclosure of a borrower's identity and the precise amount of its PPP loan would allow an interested party to deduce the borrower's total payroll with reasonable confidence." SBA Brief at 1, 8, 21. As an initial matter, total payroll is not even necessarily private information. Tens of thousands of non-profits received PPP loans, *see* Christian Berthelsen, *Carnegie Hall Is Among Cultural Sites That Got PPP Aid*, Bloomberg, July 6, 2020, https://www.bloomberg.com/news/articles/2020-07-06/carnegie-hall-whitney-museum-and-s-f-symphony-got-ppp-loans ("More than 42,000 nonprofits received at least $150,000 in PPP aid apiece."), and these organizations annually report total salaries, other compensation, and employee benefits on their IRS Form 990s, which in turn are made public, *see, e.g.*, Ken Schwencke et al., *Nonprofit Explorer*, ProPublica, June 17, 2020, https://projects.propublica.org/nonprofits/. Exemption 4 does not permit the SBA to withhold Loan Data on the grounds that it will reveal payroll information already in the public record. Even before conducting the Exemption 4 analysis, therefore, it is clear the SBA must release the Loan Data with respect to tens of thousands of borrowers for which it was withheld.

  Moreover, even assuming *arguendo* that a for-profit borrower's payroll is customarily and actually treated as private, the SBA's Exemption 4 claim falls apart because there is no direct link between the size of a PPP loan and the borrower's payroll. Under SBA regulations, calculating the amount that a business can borrow under the PPP is a four-step process:

Step 1:     Add up total compensation to employees (whose principal place of residence is the United States) in 2019, including salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; and payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; and payment of state and local taxes assessed on compensation of employees.

Step 2:     Subtract compensation of all employees in excess of an annual salary of $100,000;

Step 3:     Divide the amount from Step 2 by 12.

Step 4:     Multiply the amount from Step 3 by 2.5.

*See Interim Final Rule, Business Loan Program Temporary Changes, Paycheck Protection Program*, 85 Fed. Reg. 20,811, 20,812-13 (Apr. 15, 2020).  Knowing how much a business <u>actually</u> borrowed under the PPP thus provides no insight into its payroll unless one simply assumes that (1) borrowers take the maximum amount available; and (2) borrowers cap salaries at $100,000.

On the first assumption, the SBA provides no basis whatsoever to assert that PPP borrowers always, or even often, accepted the maximum amount available to them.  To the contrary, in determining how much to borrow, businesses were on notice that the SBA would forgive their PPP loans only if those businesses expended a sufficient portion of the funds on designated budget items.  *See supra* at 4.  If a business borrowed too much and was unable to hit those spending thresholds, it risked losing the possibility of loan forgiveness.  Thus, as a matter of basic economics, the PPP provided a <u>disincentive</u> for businesses to automatically borrow the maximum dollar amount available.  The argument for applying Exemption 4 to the PPP loans thus rests on a faulty premise.

16

On the second assumption, the SBA states that "[n]ationwide, many businesses are unlikely to pay any salaries in excess of $100,000." Manger Decl. ¶ 98. For one, Mr. Manger cites nothing at all to support this speculative statement. *Id.* For another, businesses paying salaries of greater than $100,000 did indeed take out PPP loans. Those recipients included, for example, "at least 45 law firms in the Am Law 200—more than a fifth of the nation's 200 highest-grossing law firms," many of which pay annual salaries of over $100,000 to even their most junior associates.[7] The SBA thus bases its argument on yet another unreliable premise – that PPP borrowers as a whole paid people less than $100,000 in salary – and its Exemption 4 claim fails accordingly.

Looking at the Loan Data, an observer would have no way of knowing whether any given borrower took less than the maximum or pays salaries of over $100,000. This Court therefore would find no basis in the record to reasonably conclude that the amount borrowed reveals the borrower's average payroll. Because the Loan Data does not reveal any information about the borrowers that is "customarily or actually treated as private," the SBA may not withhold the information under Exemption 4 as clarified by *Argus Leader*.

## 2.   The Loan Data was provided under an assurance of *disclosure*.

As discussed above, the Supreme Court in *Argus Leader* left unresolved whether Exemption 4 protects information provided to the government without an assurance of confidentiality. 139 S. Ct. at 2363. The Supreme Court instructed, however, that interpreting Exemption 4 turns on the "ordinary, contemporary, common meaning" of the term "confidential"

---

[7] *See, e.g.*, Dylan Jackson, *Dozens of Big Law Firms Received Millions in PPP Loan Funds*, The American Lawyer, July 6, 2020, https://www.law.com/americanlawyer/2020/07/06/big-law-firms-received-millions-through-ppp-loans/.

at the time "when Congress enacted FOIA in 1966." *Id.* at 2362 (citation omitted).  No

definition of "confidential," at any point in time, would encompass information that, as here, the

government received with the explicit assurance that it would be made public.

      First, the PPP loan application declared to potential borrowers that "[i]nformation about

approved loans *will be automatically released*," including "the names of the borrowers" and "the

amount of the loan."  SBA Brief at 17 (emphasis added); SBA, *Paycheck Protection Program*

*Borrower Application Form*, https://www.sba.gov/sites/default/files/2020-07/PPP-Borrower-

Application-Form-508.pdf at 4.  No doubt recognizing that this disclaimer concedes its

Exemption 4 claim, the SBA engages in circular argument.  According to the SBA, because

(1) the application also contains the amorphous statement that "[p]roprietary data on a borrower

would not routinely be made available to third parties," and (2) the amount of the loan ostensibly

would reveal "proprietary data" in the form of total payroll, the application actually "reinforces

the conclusion that SBA promised confidentiality" of the Loan Data.  SBA Brief at 17.  In this

way, the SBA contends, its pledge to disclose borrower names and loan amounts means the exact

opposite of what it says.

      This argument fails for two reasons.  For one, again, the amount of the loan does not

reveal the borrower's payroll.  *See supra* at 15-17.  For another, the SBA ignores the basic

interpretive principle that "[a] specific provision controls one of more general application."

*Gozlon-Perez v. United States*, 498 U.S. 395, 407 (1991).  The SBA told borrowers specifically

that it would disclose borrower names and amounts borrowed pursuant to FOIA, and it assured

borrowers generally that the government would protect "proprietary" information.  Even if those

two provisions conflict, and they do not, "[t]o eliminate the contradiction, the specific provision

[must be] construed as an exception to the general one."  *RadLAX Gateway Hotel, LLC v.*

*Amalgamated Bank*, 566 U.S. 639, 645 (2012).  By expressly telling borrowers that their names and loan amounts would be public record, therefore, the SBA made it clear that the Loan Data is not proprietary information, and the SBA itself rendered Exemption 4 inapplicable.

Second, the Federal Funding Accountability and Transparency Act of 2006 provides that the Office of Management and Budget "shall" publish on the Internet the "name of the entity receiving the award" and "the amount of the award" for "[f]ederal award[s]" of $25,000.00 or more, where "[f]ederal award" is defined specifically to include "loans . . . and other forms of financial assistance."  31 U.S.C. § 6101 note § 2(a)(4) & (b)(1); *see also, e.g.*, Cezary Podkul & Ryan Tracy, *SBA Accused of Skirting Financial Disclosure Rule*, The Wall Street Journal, Aug. 25, 2020, https://www.wsj.com/articles/sba-accused-of-skirting-financial-disclosure-rule-11598353200.  The SBA cannot have "implicitly" assured borrowers that their names and loan amounts would be kept confidential when an existing federal statute obliged the government to make that same information public, at least as to loans to businesses of $25,000 or more.

To prevail on its Exemption 4 claim, the SBA needed to show that the Loan Data reveals information customarily and actually treated as private.  At the very least, regardless of the open question in *Argus Leader*, it cannot tenably deny that it expressly promised borrowers this information would be disclosed.  The SBA has failed to meet its burden for these two, independent reasons.  As a result the SBA cannot withhold the Loan Data under Exemption 4.

**B.      The SBA Has Not Justified Withholding Loan Data Under Exemption 6.**

The SBA also cannot deny the powerful public interest in how it has implemented the PPP and EIDL during a time of historic economic crisis, especially with the information already available that casts doubt on the efficiency and integrity of that process.  Notwithstanding these compelling reasons for maximum transparency, the SBA seeks to withhold under Exemption 6

the names and addresses of the vast majority of PPP recipients – those who borrowed less than $150,000 – as well as the names and addresses of all "sole proprietorships and independent contractors that received EIDL loans."  SBA Brief at 18.  Because Exemption 6 allows the government to withhold only "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), the SBA cannot justify these withholdings.

To assess "whether the disclosure of the information at issue . . . would rise to the level of a clearly unwarranted invasion of personal privacy," courts "balance the public interest in disclosure against the interest Congress intended [Exemption 6] to protect."  *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016) (internal marks and citations omitted).  The D.C. Circuit has further instructed that in carrying out this test, the Court "must bear in mind that FOIA mandates a strong presumption in favor of disclosure, and that the statutory exemptions, which are exclusive, are to be narrowly construed."  *ACLU v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (internal marks and citations omitted).

The Exemption 6 balancing test compels disclosure in this case.  On one end of the scale, PPP and EIDL borrowers have little if any privacy interest in their names and the amounts they borrowed.  On the other end of the scale, the public interest in disclosure is overpowering.

### 1.    Any privacy interest in the Loan Data is minimal at most.

As with Exemption 4, the SBA's Exemption 6 claim collapses at the outset because the agency expressly told borrowers that their names and loan amounts would be public.  Whether they borrowed more or less than $150,000, PPP recipients completed an application assuring that "[i]nformation about approved loans will be *automatically* released," including "the names of the borrowers" and "the amount of the loan."  SBA Brief at 17 (emphasis added).  Likewise, the

SBA told EIDL applicants that FOIA generally requires it to release "information such as names of borrowers" as well as "loan amounts at maturity, the collateral pledged, and the general purpose of loans."  *See* SBA, *COVID-19 Economic Injury Disaster Loan Application*, https://www.sba.gov/sites/default/files/articles/SBA_Form_3501_Economic_Injury_Disaster_Loan_Application.pdf at 12.  Borrowers thus had no reasonable expectation of privacy in the Loan Data the SBA now seeks to withhold as private.

Courts have rejected Exemption 6 claims on this very ground in similar circumstances.  In *Alliance for the Wild Rockies v. Department of the Interior*, for example, the court called it "remarkable" for the government to "object to disclosure of the names and addresses" of persons who submitted comments in response to a notice of proposed rulemaking where the government had "made it abundantly clear . . . that the individuals submitting comments to its rulemaking would not have their identities concealed."  53 F. Supp. 2d 32, 37 (D.D.C. 1999).  The court weighed this minimal privacy interest against "a considerable public interest in assuring governmental accountability" and found that FOIA required release of the information.  *Id.*

More recently, the FCC failed in its attempt to withhold under Exemption 6 the email addresses of members of the public who submitted "bulk comments" on the issue of net neutrality, in part because those "bulk submitters had ample indication that their email addresses could be made public, mitigating any expectation of privacy."  *Prechtel v. FCC*, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (citing *Alliance for the Wild Rockies*, 53 F. Supp. 2d at 37).  The court noted specifically that persons submitting bulk comments "did so through a widget on the FCC's website," which contained a disclaimer that "[a]ll information submitted, including names and addresses, will be publicly available via the web."  *Id.* (alteration omitted).  As the court put it, this warning "could hardly have been more straightforward."  *Id.*  The court then weighed

whatever minimal privacy interest these commenters still had in the information against the
"significant" public interest in disclosure, which could assist in preventing "fraud and abuse,"
and the court concluded that FOIA required disclosure of the requested material.  *Id.* at 331-32.

Here, too, the message to borrowers could hardly have been clearer: the SBA expressly
stated to PPP and EIDL applicants that their names and the amounts of their loans would be
public record.  The borrowers thus have no reasonable expectation of privacy in the Loan Data,
and the privacy end of the scale is as light as can possibly be in this particular balancing test.

The SBA's attempts to heighten the privacy interest in the Loan Data do not alter this
conclusion.  For one, the SBA asserts that upon disclosing the borrowers, "everyone would know
that these individuals have (or at least recently had) money in the bank," and that "[t]he D.C.
Circuit has been 'particularly concerned' when names and addresses 'may be used for
solicitation purposes' or other financial inquiries."  SBA Brief at 20.  For another, the SBA notes
that as a consequence of disclosure, "the public would . . . learn not only that individuals had
received particular loans, but also that those individuals felt the loans were 'necessary to support
ongoing operations' given 'the uncertainty of current economic conditions.'"  *Id.* at 21
(alterations omitted).  These arguments fail for four reasons.  First, the SBA's concerns are
entirely speculative and cannot satisfy the new foreseeable harm standard discussed in detail
below.  *See infra* at 28-29.  Second, the court rejected as "implausible" nearly identical concerns
about solicitation in *Washington Post Co. v. United States Department of Agriculture*, observing
that "Exemption 6 is designed to protect against unwarranted invasions of *personal* privacy and
not typically to protect businesspeople from commercial mailings directed at their business
needs," and moreover that such businesspeople "can be expected to handle solicitations . . . with
equanimity."  943 F. Supp. 31, 35 (D.D.C. 1996) (emphasis in original).  Third, it is likewise

implausible to think that truly small businesses (as opposed to large public companies that also received PPP loans) would bear any stigma for having accepted financial support on extremely favorable terms at a time of economic calamity.  Fourth, the SBA's two concerns actually cut against one another: the more that a business's "financial condition" appears "precarious" for having received federal assistance, the less attractive a target that business presents to solicitors "who would like to secure a share" of the borrower's good fortune, and vice versa.  *See* SBA Brief at 21 (citations omitted).  Any privacy interest in the Loan Data thus remains minimal.

**2.     The enormous public interest in the Loan Data requires its disclosure.**

Even if the SBA were able to articulate a more-than-minimal privacy interest in the Loan Data, the Court still must weigh it against the public interest in release of the information.  That public interest is overwhelming in this case, as controlling D.C. Circuit precedent and other persuasive authority make clear.  The Exemption 6 scale thus tips decisively for disclosure.

In *Multi AG Media LLC v. Department of Agriculture*, a FOIA requestor sought records related to the USDA's "agricultural subsidy and benefit programs," and the agency withheld certain responsive records under Exemption 6 on the basis that the records "would reveal financial information" about individual farms.  515 F.3d 1224, 1226 (D.C. Cir. 2008).  The district court allowed the USDA to withhold two of the requested databases and the D.C. Circuit reversed, concluding that "there is a significant public interest in disclosure that outweighs the personal privacy interest USDA seeks to protect."  *Id.* at 1226.  Specifically, the court held that the privacy interest in the records was not "particularly strong," while the public has a "significant interest" in the requested information.  *Id.* at 1230-32.  The D.C. Circuit expressly recognized that "there is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits," and that

23

such a public interest is especially apparent where "Congress has recognized the importance of ensuring the responsible use of these funds" by creating an Office of Inspector General to "prevent and detect fraud and abuse."  *Id.* at 1232-33.

Here, Plaintiffs seek records on the distribution of a staggering amount of public moneys: over half a trillion dollars through the PPP alone.  *See supra* at 4.  Moreover, many of these PPP loans will be forgiven and become pure subsidies.  *Id.*  It is no surprise, therefore, that Congress recognized the importance of ensuring the responsible use of COVID-related funding by establishing the Pandemic Response Accountability Committee "to promote transparency and conduct and support oversight of covered funds and the Coronavirus response" and, *inter alia*, "prevent and detect fraud, waste, abuse, and mismanagement."  *See* CARES Act § 15010(b).  Under *Multi AG Media*, therefore, the public interest in the Loan Data is dispositive.

An earlier case that the D.C. Circuit cited in *Multi AG Media* with approval, *News-Press v. Department of Homeland Security*, is equally instructive.  There, news organizations sought information from the Federal Emergency Management Agency ("FEMA") about claims for federal aid and insurance made after federally-declared disasters, and FEMA sought to withhold those records – which the court noted would reveal "whether FEMA has been a good steward of billions of taxpayer dollars" – under Exemption 6.  489 F.3d 1173, 1178 (11th Cir. 2007).  The Eleventh Circuit "acknowledge[d] the privacy interests at stake," but it held that disclosure was required because the "the magnitude of this public interest is potentially enormous," further observing that it is "precisely the kind of public interest that meets the FOIA's core purpose of shedding light on what the government is up to."  *Id.* at 1206.

Perhaps the case most on point, however, is *Washington Post Co. v. Department of Agriculture*, where the *Post* sought "the names and addresses of, and amounts paid to,

individuals and business entities that received payments . . . under the USDA cotton price

support program," which amounted to approximately $1 billion in subsidies.  943 F. Supp. 31,

33.  The USDA withheld the information under Exemption 6, and the court first found a

"minimal" privacy interest in the records, then found a "substantial" public interest "in shedding

light on the workings of the [USDA] and the administration of this massive subsidy program."

*Id.* at 36.  In particular, the court noted that the *Post* had "identified allegations of fraud and

conflict of interest, supported by government reports and investigations, as well as newspaper

articles and other information in the public domain, sufficient to raise nonspeculative questions

about the workings of the USDA," and it therefore concluded that "[u]nder the FOIA's

presumption in favor of disclosure and its core purpose of informing the public about the

workings of government, no more is required" to overcome the Exemption 6 claim.  *Id.; see also*

*Buffalo Evening News, Inc. v. SBA*, 666 F. Supp. 467, 472 (W.D.N.Y. 1987) (rejecting SBA's

Exemption 6 claim as to loan-related data based in part on "the large amounts of unpaid balances

suggesting a potential misuse of public funds").

 Here, too, Plaintiffs have identified numerous allegations of fraud and conflict of interest

with respect to the SBA's COVID assistance programs.  *See supra* at 7-8.  These allegations are

supported by dozens of new federal prosecutions.  *See, e.g.*, Pandemic Response Accountability

Comm., *Investigative Press Releases*, https://pandemic.oversight.gov/oversight/investigative-

press-releases (listing "press releases from U.S. Attorney's Offices announcing pandemic-related

cases").  They are further supported by news reports addressing widespread concerns over

alleged fraud, conflicts of interest, and inequitable treatment relating to these loan programs –

including reports by each of the Plaintiffs.[8]  Coupled with the fact that the U.S. economy is in its

most precarious state at least since the Great Recession, and perhaps since the Great Depression,

the public has an undeniably great interest in knowing "what their government is up to" here.

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)

(citations omitted).

Indeed, that public interest is greater still given that Congress is now proposing "[t]o

provide automatic forgiveness for [PPP] loans under $150,000" – *i.e.*, the loans whose recipients

---

[8] *See* Paul P. Murphy, *Man spent PPP funds on hotels, jewelry and $318,497 Lamborghini, authorities say*, CNN, July 28, 2020, https://www.cnn.com/2020/07/28/us/ppp-funds-miami-lamborghini-trnd/index.html; Michael Tobin, *Tech Executive Charged With PPP Fraud Deposited in Robinhood*, Bloomberg, July 23, 2020, https://www.bloomberg.com/news/articles/2020-07-24/tech-executive-charged-with-ppp-fraud-deposited-in-robinhood; Cezary Podkul & Orla McCaffrey, *Firms With Troubled Pasts Got Millions of Dollars in PPP Small-Business Aid*, The Wall Street Journal, July 18, 2020, https://www.wsj.com/articles/firms-with-troubled-pasts-got-millions-of-dollars-in-ppp-small-business-aid-11595064602; Chris Mathews, *Two Houstonians charged with PPP-related fraud*, Houston Business Journal, July 15, 2020, https://www.bizjournals.com/houston/news/2020/07/15/two-houstonians-charged-with-ppp-fraud.html; Emily Flitter, *Black Business Owners Had a Harder Time Getting Federal Aid, a Study Finds*, The New York Times, July 15, 2020, https://www.nytimes.com/2020/07/15/business/paycheck-protection-program-bias.html; Brian Slodysko & Angeliki Kastanis, *Trump donors among early recipients of coronavirus loans*, Associated Press, July 7, 2020, https://apnews.com/00a34243825661313f2cb6a0f6a21720; Jack Gillum, et al., *Trump Friends and Family Cleared for Millions in Small Business Bailout*, ProPublica, July 7, 2020, https://www.propublica.org/article/trump-friends-and-family-cleared-for-millions-in-small-business-bailout; Jonathan O'Connell, et al., *Treasury, SBA data show small-business loans went to private-equity backed chains, members of Congress*, The Washington Post, July 6, 2020, https://www.washingtonpost.com/business/2020/07/06/sba-ppp-loans-data/; Sarah Kolinovsky, *Minority-owned small businesses still struggle to access billions in stimulus*, ABC News, June 10, 2020, https://abcnews.go.com/Politics/minority-owned-small-businesses-struggle-access-billions-stimulus/story?id=71172904; Ben Popken, *Why are so many black-owned small businesses shut out of PPP loans?*, NBC News, Apr. 29, 2020, https://www.nbcnews.com/business/business-news/why-are-so-many-black-owned-small-businesses-shut-out-n1195291; Aaron Glantz, *Bailout money bypasses hard-hit New York, California for North Dakota, Nebraska*, Reveal, Apr. 23, 2020, https://www.revealnews.org/article/bailout-money-bypasses-hard-hit-new-york-california-for-north-dakota-nebraska/.

the SBA has so far kept secret.  *See Paycheck Protection Small Business Forgiveness Act*,

S. 4117 & H.R. 7777, https://www.congress.gov/bill/116th-congress/senate-bill/4117/text &

https://www.congress.gov/bill/116th-congress/house-bill/7777/text.  Moreover, the SBA has

provided "blanket approval" for "lawmakers, [SBA] staff, and other federal officials and their

families" to obtain PPP funds for themselves, such that continued secrecy could allow

government officials to essentially forgive loans to themselves without the public ever knowing

how the money changed hands.  Jonathan O'Connell & Aaron Gregg, *SBA exempted lawmakers,*

*federal officials from ethics rules in $660 billion loan program*, The Washington Post, June 26,

2020, https://www.washingtonpost.com/business/2020/06/26/sba-exempted-lawmakers-federal-

officials-ethics-rules-660-billion-loan-program/ at 1.  This possibility belies the SBA's claim that

it has released "more than enough information to meaningfully inform the public what its

government is up to in administering these loan programs."  SBA Brief at 25.

  Plaintiffs' own reporting makes clear that the SBA has not released enough information

to ensure proper oversight.  For example, journalists could not uncover the total amount of PPP

funds the Catholic Church obtained after religious groups "persuaded the Trump administration

to free them from a rule that typically disqualifies an applicant with more than 500 workers."

Reese Dunklin & Michael Rezendes, *Catholic Church lobbied for taxpayer funds, got $1.4B*,

Associated Press, July 10, 2020, https://apnews.com/dab8261c68c93f24c0bfc1876518b3f6

(estimating that the Church received "between $1.4 billion and $3.5 billion" and explaining that

journalists "couldn't find more Catholic beneficiaries because the government's data . . . didn't

name recipients of loans under $150,000 – a category in which many smaller churches would

fall.").  Similarly, reporters could not determine the "precise number" of minority-owned

businesses receiving PPP loans in Minnesota in part because those "that took out PPP loans of

less than $150,000 . . . were not disclosed."  Iain Carlos, *Many of Twin Cities' largest minority-owned firms tapped PPP loans*, Minneapolis/St. Paul Business Journal, July 9, 2020, https://www.bizjournals.com/twincities/news/2020/07/09/largest-minority-owned-firms-tapped-ppp-loans.html.  The SBA's Exemption 6 withholdings have therefore stymied FOIA's principal purpose of "open[ing] agency action to the light of public scrutiny."  *Rose*, 425 U.S. at 360-61 (citation omitted).

Because the enormous public interest in releasing the Loan Data clearly outweighs the miniscule privacy interest in its continued secrecy, the Court should conclude that Exemption 6 compels the SBA to disclose the Loan Data promptly and in full.

**C.      The SBA Has Not Satisfied FOIA's New Foreseeable Harm Standard.**

The SBA fails to justify its secrecy for yet another reason: following the FOIA Improvement Act of 2016, the statute now provides that agencies may withhold information "only if . . . the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA exemption]," or if "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).  The SBA does not even attempt to satisfy this new foreseeable harm standard, nor could it possibly do so.

While the precise contours of the foreseeable harm standard continue to develop, the D.C. Circuit recently stated that it has "no quarrel with [the] proposition" that "agencies, to justify withholding records under FOIA's foreseeable-harm provision, cannot simply rely on 'generalized' assertions that disclosure 'could'" harm an interest protected by the enumerated FOIA exemptions.  *Amadis v. Dep't of State*, No. 19-5088, 2020 U.S. App. LEXIS 26633, at *12 (D.C. Cir. Aug. 21, 2020).  Similarly, in *Judicial Watch, Inc. v. Department of Commerce*, the district court stated that "[t]he question is not whether disclosure could [harm a protected interest], but rather if it is reasonably foreseeable that it will [do so] and, if so, what is the link

between this harm and the specific information contained in the material withheld."  375 F. Supp. 3d 93, 101 (D.D.C. 2019); *accord Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 259-60, 266 (D.D.C. 2020) (collecting cases and finding agency failed to satisfy foreseeable harm standard for certain withholdings).  FOIA thus "requires more than speculation" to withhold records under the exemptions the SBA cites here.  *Judicial Watch*, 375 F. Supp. 3d at 101.

The SBA does not rise above mere speculation, however, in claiming that release of the Loan Data could cause harms under Exemptions 4 and 6.  Indeed, its principal basis for withholding the Loan Data rests entirely on speculation – namely, that the size of these loans necessarily reveals confidential or private information about their borrowers.  *See supra* at 15-17. The SBA has thus failed to satisfy the foreseeable harm standard as to release of the Loan Data.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that their cross-motion for summary judgment be granted, that the SBA's motion for summary judgment be denied, that the SBA be ordered to disclose the Loan Data in full, and that Plaintiffs be awarded their costs and reasonable attorneys' fees incurred in this action.

Dated:  September 8, 2020

Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Kristel Tupja (#888324914)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
tupjak@ballardspahr.com

*Counsel for Plaintiffs*

29