**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WP COMPANY LLC d/b/a THE
WASHINGTON POST, BLOOMBERG
L.P., DOW JONES & COMPANY, INC.,
PRO PUBLICA, INC., THE NEW YORK
TIMES COMPANY, AMERICAN
BROADCASTING COMPANIES, INC.
d/b/a ABC NEWS, AMERICAN CITY
BUSINESS JOURNALS, CABLE NEWS
NETWORK, INC., NBCUNIVERSAL
MEDIA, LLC d/b/a NBC NEWS, THE
ASSOCIATED PRESS, THE CENTER FOR
INVESTIGATIVE REPORTING
d/b/a REVEAL,

    *Plaintiffs,*

  v.

U.S. SMALL BUSINESS
ADMINISTRATION,

    *Defendant*.

Case No. 1:20-cv-01240
(JEB)

**COMBINED REPLY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Dated: September 22, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

INDRANEEL SUR
JAMES BICKFORD
Trial Attorneys

Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 616-8448
E-mail:  Indraneel.Sur@usdoj.gov

*Counsel for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

   I.    SBA Properly Withheld Some Loan-Level PPP Data Under FOIA Exemption 4 ............. 3

       A.    Average Payroll Information Is Properly Protected Under *Argus Leader*............. 4

       B.    SBA Properly Withheld PPP Loan Amounts to Prevent Disclosure of Average Payroll Information Borrowers Customarily Keep Confidential............................ 6

       C.    Although There is No Need to Reach the Question, SBA Properly Assured Borrowers the Agency Would Safeguard their Proprietary and Confidential Payroll Information ................................................................................................. 8

       D.    Statutes Outside the CARES Act Do Not Undermine SBA's Exemption 4 Withholdings.................................................................................................. 11

  II.   SBA Properly Withheld the Names and Addresses of Certain PPP and EIDL Borrowers Under Exemption 6 ................................................................................. 13

 III.  SBA Has Provided Specific Reasonably Foreseeable Harms That Would Result from Disclosure for All Withholdings .................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Dep't of the Interior*,
   53 F. Supp. 2d 32 (D.D.C. 1999) ........................................................ 15

*Consumers' Checkbook Ctr. v. Dep't of Health & Human Servs.*,
   554 F.3d 1046 (D.C. Cir. 2009) .................................................... 13, 14

*Deal v. United States*,
   508 U.S. 129 (1993) ......................................................................... 11

*Flightsafety Services Corp. v. Department of Labor*,
   326 F.3d 607 (5th Cir. 2003) ............................................................... 6

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2365 (2019) ............................................................... 4, 5, 6

*Forsham v. Harris*,
   445 U.S. 169 (1980) ........................................................................... 8

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
   559 U.S. 280 (2010) ......................................................................... 11

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ......................................................................... 11

*Judicial Watch v. FDA*,
   449 F.3d 141 (D.C. Cir. 2006) ........................................................... 13

*Lepelletier v. FDIC*,
   164 F.3d 37 (D.C. Cir. 1999) ...................................................... 13, 15

*Maydak v. U.S. Dep't of Justice*,
   218 F.3d 760 (D.C. Cir. 2000) ............................................................. 8

*Multi AG Media v. Dep't of Agric.*,
   515 F.3d 1224 (D.C. Cir. 2008) .................................................... 13, 14

*NARFE v. Horner*,
   879 F.2d 873 (D.C. Cir. 1989) ........................................................... 15

ii

*Nat'l Parks & Conservation Ass'n v. Kleppe*,
   547 F.2d 673 (D.C. Cir. 1976) ........................................................................ 5, 14

*Nat'l Parks & Conservation Ass'n v. Morton*,
   498 F.2d 765 (D.C. Cir. 1974) ............................................................................. 4

*Painting & Drywall Pres. Fund v. Dep't of Hous. & Urban Dev.*,
   936 F.2d 1300 (D.C. Cir. 1991) .......................................................................... 15

*Prechtel v. FCC*,
   330 F. Supp. 3d 320 (D.D.C. 2018) .................................................................... 14

*U.S. Dep't of Justice v. Landano*,
   508 U.S. 165 (1993) ............................................................................................. 9

*Wash. Post Co. v. U.S. Dep't of Agric.*,
   943 F. Supp. 31 (D.D.C. 1996) .......................................................................... 15

**Statutes**

5 U.S.C. § 552 ........................................................................................................ 17

15 U.S.C. § 636 ................................................................................................... 1, 15

26 U.S.C. § 6033 ............................................................................................... 11, 12

Coronavirus Aid, Relief, and Economic Security (CARES) Act Pub. L. No. 116-136,
   134 Stat. 281 ......................................................................................................... 1

Digital Accountability and Transparency Act, Pub. L. No. 113-101, 128 Stat. 1146 ........... 12, 13

Federal Funding Accountability and Transparency Act of 2006, Pub. L. No. 109-282,
   120 Stat. 1186 ...................................................................................................... 12

**Regulations**

26 C.F.R. 1.6033-2 ................................................................................................................ 11

85 Fed. Reg. 20,811 (Apr. 15, 2020) .................................................................................... 7

**Other Authorities**

H.R. Rep. No. 114-391(2016) ................................................................................................ 17

iv

## INTRODUCTION

The President signed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which created the Paycheck Protection Program (PPP), into law on March 27, 2020.  Pub. L. No. 116-136, 134 Stat. 281; *see* 15 U.S.C. § 636(a)(36).[1]  The first PPP loans were disbursed on April 3, exactly one week later.  In those seven days, the U.S. Small Business Administration (SBA) worked with the Department of the Treasury and private lenders to implement a brand-new program under intense time pressure, ensuring that millions of small businesses would have access to much-needed financial support amidst a global pandemic.  As part of those efforts, the SBA prepared a simple two-page application form, followed by two pages of disclosures, including disclosures concerning the Freedom of Information Act, transplanted from the agency's application for loans made under Section 7(a) of the Small Business Act.  *See* 2d Manger Decl. ¶¶ 13-18.

Plaintiffs contend that the FOIA language assured each PPP borrower that SBA would release its name and loan amount, yet that contention not only demands that the Court reach a question it need not reach (whether SBA gave borrowers an assurance of confidentiality),  but is wrong on its own terms.  That contention hinges on isolated phrases in the disclosure, and impermissibly fails to consider the disclosure as a whole while ignoring the context.  The FOIA language did not purport to set aside SBA's longstanding Standard Operating Procedure, which pledged to maintain the confidentiality of borrower payroll information.  Moreover, the FOIA disclosure itself informed the borrower that its "[p]roprietary data . . . *would not* routinely be made

---

[1]  Terms defined in the memorandum supporting SBA's summary judgment motion (filed Aug. 18, 2020) (Doc. 14) ("Mem.") have the same meaning herein. Citations to Plaintiffs' memorandum in opposition and supporting their cross-motion (filed Sept. 8, 2020) (Doc. 17; *accord* Doc. 18-1) are of the form "Opp. __."

available to third parties," which was a commitment by SBA that confidential data, such as payroll information, would not be released.

Plaintiffs' contention that the boilerplate disclosures about FOIA now override SBA's Exemption 4 and 6 analysis, and mandate the release of information from which average borrower payroll could be derived with reasonable confidence—including the identities of the smallest borrowers, notwithstanding their strong privacy interest in their financial information—thus hinges on an untenable construction of the FOIA disclosure. Particularly in light of the extraordinary timeframe involved here (again, SBA issued the borrower form within one week of the passage of the CARES Act), that contention is properly rejected.

Plaintiffs' other arguments under Exemptions 4 and 6 also fall short. Plaintiffs do not (because they cannot) dispute that a business's average monthly payroll is confidential business information protected from disclosure by Exemption 4. Instead, Plaintiffs attempt to question whether payroll information really is discernable from the amount of a PPP loan. Plaintiffs' contention depends on their supposition that many PPP borrowers may have borrowed less than the full loan amount the statute made available to them; so, Plaintiffs conjecture, perhaps the public and the borrowers' business competitors might not be able figure out the borrowers' payroll. In other words, if the borrowers borrowed less than the full amount to which they were entitled, then their payroll would be larger than it would appear from the amount of the PPP loan. Or maybe, Plaintiffs argue, the borrowers pay their employees more than the $100,000, so PPP loan funds would not be available to replace some portion of their payroll.

But Plaintiffs' counterfactual suppositions ignore the practical realities of the PPP and the real-life circumstances of the borrowers that flocked to the program. PPP loans were made on very favorable terms, and borrowers were under severe economic distress from the pandemic, with

2

every incentive to secure as much funding as they could.  The loan application told potential borrowers that their "Average Monthly Payroll . . . x 2.5 . . . Equals Loan Request."  2d Manger Decl. ¶ 9.  Applicants had every reason to borrow as much as they could, and the application form guided them to do so.  Moreover, Plaintiffs have offered no reason to believe that the fraction of small business employees that earn more than $100,000 a year is so high that it would confound the otherwise clear, formulaic relationship between a business's payroll and the size of its PPP loan.  SBA's evidence and experience show otherwise, as explained in the agency's declarations.

As to Exemption 6:  Plaintiffs fare no better in arguing that the public interest mandates the release of the smallest borrowers' identities, notwithstanding the strong interest in the privacy of borrowers' financial information.  Plaintiffs' argument again rests almost entirely on the language of the FOIA disclosure in the PPP application form.  Plaintiffs cannot otherwise deny that the smallest borrowers have significant privacy interests in their financial information, which outweigh any interest the public might have in their identities.

For the reasons set forth more fully below, and in SBA's opening brief and its declarations, the agency's decision to withhold some pieces of loan-level data pursuant to Exemption 4 and Exemption 6, to protect borrowers' confidential payroll information and personal privacy, was authorized by FOIA and should not be disturbed.

## ARGUMENT

### I.   SBA Properly Withheld Some Loan-Level PPP Data Under FOIA Exemption 4

For loans of $150,000 or more, SBA released the borrower name and address and disclosed the loan amounts in ranges.  Conversely, for loans of less than $150,000, SBA withheld the borrower name and address (thereby protecting personal privacy under Exemption 6), while releasing the precise loan amount.  As explained (Mem. 7-18), SBA properly applied Exemption

3

4 when it withheld precise loan amounts for some loans and borrowers' names and addresses for others.  That approach was necessary to prevent the disclosure of any individual borrower's average payroll, which is confidential commercial or financial information under Exemption 4.

A.    **Average Payroll Information Is Properly Protected Under Argus Leader**

At the outset, Plaintiffs err in contending (Opp. 14 n.6) that SBA's explanation of why Exemption 4 covers average payroll of particular borrowers hinges on what Plaintiffs call a legal standard "now-abrogated" by *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2365, 2366 (2019) ("*Argus Leader*").  Plaintiffs misunderstand *Argus Leader*.  There, the Supreme Court rejected the D.C. Circuit's Exemption 4 test, under which information was "confidential" only when its disclosure was shown "likely to result in 'substantial competitive harm' to the business that provided it" to the agency.  *Id.* at 2361; *see id.* at 2364 (discussing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).  The Supreme Court eliminated the earlier test's requirement that the agency "prove that the disclosure of a source's information would result in" such "substantial competitive harm."  *Id.* at 2364.   Instead, the Court held that Exemption 4 covers the information sought (store-level data about a federal benefit program), without requiring proof of "substantial competitive harm."   The information sought by the newspaper's FOIA request, the Court concluded, qualified for the exemption because it was "customarily kept private, or at least closely held, by the person imparting it," given that "retailers customarily do not disclose" such data, "or make it publicly available 'in any way.'"  *Id.* at 2363.  (The Court also observed that Exemption 4 disputes could raise a second, additional question:  "Can privately held information *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private?"  *Id.*  But the Court determined that it had "no need to resolve" that second question, because the condition was

4

"clearly satisf[ied]," given that "the government ha[d] long promised" the retailers "that it will keep their information private."  *Id.*)

The *Argus Leader* Court thus freed agencies from having to prove that disclosure would cause "substantial competitive harm."  But the Court did not hold that competitive harm ("substantial" or otherwise) is unavailable as a circumstance an agency can examine as part of its Exemption 4 analysis.  To the contrary, competitive harm could be relevant to confidentiality (depending on context).  Anticipation of competitive harm could, for example, explain *why* the requested information would "customarily [be] kept private, or at least closely held, by the person imparting it" to the agency.  *See id.*  The *Argus Leader* Court did not suggest, and there is no other basis for concluding, that SBA is foreclosed from recognizing the competitive harm that would result to borrowers if SBA enabled their average payroll information to be derived from PPP loan amounts.  Rather, the potential exploitation by competitors is simply one valid ground for concluding that the information is "customarily kept private, or at least closely held" by borrowers. *Argus Leader*, 139 S. Ct. at 2363.

Notably, Plaintiffs cite no precedents holding that payroll or wage information is *not* properly protected by Exemption 4.  Although SBA's analysis in this case is not predicated on "substantial competitive harm" precedents overruled by *Argus Leader*, it warrants mention that even under the more burdensome "substantial competitive harm" test*,* the D.C. Circuit identified "wages" as among the types of information covered by Exemption 4.  *See Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976) (protecting information that competitors could use "to bargain for higher prices, *wages* or interest rates") (emphasis added).  Although the "substantial competitive harm" test no longer applies, the *Argus Leader* Court did *not* hold that information previously *protected* under Exemption 4 using that test *cannot* be

protected using the "customarily kept private" test (which is easier for an agency to satisfy because it omits the "substantial competitive harm" element). Plaintiffs thus have furnished the Court with no reason for doubting that Exemption 4 covers payroll information.

After misunderstanding the *Argus Leader* Court's analysis, Plaintiffs proceed to object to several aspects of SBA's application of the Exemption 4 standard to the particular PPP loan data withheld. As explained below, each objection is incorrect.

### B. SBA Properly Withheld PPP Loan Amounts to Prevent Disclosure of Average Payroll Information Borrowers Customarily Keep Confidential

As Chief of Staff Manger explained (Mem. 12-16; 1st Manger Decl. ¶¶ 90-113 (Doc. 14-1)), SBA properly withheld borrower average payroll information under Exemption 4, consistent with its long-standing Standard Operating Procedure protecting payroll information as confidential. Businesses "customarily" keep payroll "private, or at least closely held" (*Argus Leader*, 139 S. Ct. at 2363). If SBA were to release the borrowers' identities and PPP loan amounts, the public and competitors could attribute average payroll information to particular borrowers. *Flightsafety Services Corp. v. Department of Labor*, 326 F.3d 607 (5th Cir. 2003) ("*Flightsafety*") recognized that Exemption 4 protects "information regarding salaries and wages" (*id.* at 609) because compelled disclosure of the information underlying the agency's statistical determinations "present[ed] a serious risk that sensitive business information *could be attributed to a particular* submitting business" (*id.* at 612) (emphasis added). Plaintiffs, unable to cope with the *Flightsafety,* simply decline to address it. And Plaintiffs' arguments that loan amount disclosure would not compromise the customary confidentiality are incorrect.

Plaintiffs are wrong to find fault (Opp. 15-17) with aspects of SBA's explanation of how an observer could use the formula for calculating the PPP loan amount (specified in the First Interim Final Rule of April 15, 2020) to derive the average payroll for an individual borrower.

SBA's explanation assumes that a borrower took out a loan for the maximum amount allowed, and Plaintiffs criticize that assumption as unsupported.  Opp. 16.  But that criticism simply ignores the context in which borrowers obtained PPP loans.  It is beyond dispute that the pandemic resulted in serious economic distress.  (Plaintiffs attempt to describe the gravity of that overall economic distress, at least where convenient for their contentions.  *See generally* Opp. 2-3.)  Faced with "closures of restaurants, bars, and gyms" and other effects of the severe reduction in the demand for products and services because of the pandemic, businesses had an obvious reason to borrow as much as the PPP made available to them.  1st Manger Decl. ¶¶ 6-7, 15; 2d Manger Decl. ¶¶ 4-12. The borrower application form steered borrowers to calculate the maximum loan amount available to them and thus to request that amount.  2d Manger Decl. ¶ 9.  Moreover, because the CARES Act provided that each borrower would receive only *one* PPP loan, a borrower did not have an incentive to seek a smaller-than-necessary loan at the outset, because getting another PPP loan was not an option if conditions deteriorated.  2d Manger Decl. ¶ 10; *see* 15 U.S.C. § 636(a)(36)(G)(i)(IV) (requiring certification that "during" specified period borrower "has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan"); *see also* April IFR, 85 Fed. Reg. 20811, 20814 (Apr. 15, 2020) (under ¶ III.2.t.vi applicant must certify that it has not "receive[d] another loan under" program).  SBA's assumption that each borrower would seek to borrow the maximum amount allowed under the PPP thus appropriately reflected the seriousness of the distress that gave rise to the PPP.

Also incorrect is Plaintiffs' assertion (Opp. 17) that SBA lacked sufficient grounds for assuming, when explaining the logical connection between loan amount and average payroll, that a PPP borrower would pay few if any of its employees more than $100,000.  Plaintiffs point to a

news media report describing PPP loans to certain large "law firms in" a list of 200 highly profitable law firms compiled by *American Lawyer* magazine, and Plaintiffs contend that the SBA ignored the tendency of salaries at such law firms (among other borrowers) to exceed $100,000. But even assuming that the report's description of large law firm compensation is correct, Plaintiffs miss the forest for the trees.  The existence of *some* PPP borrowers with "many" employees paid "salaries of over $100,000" (Opp. 17) does not mean that *most*, or even anything other than a tiny fraction of PPP borrowers pay annual salaries exceeding $100,000.  Indeed, the vast majority of PPP borrowers have no employees who earn more than $100,000 per year.  *See* 2d Manger Decl. ¶¶ 11-12.  Moreover, when SBA concluded that Exemption 4 protection of the loan amount was warranted for the entire category of PPP loans, SBA was not required to examine borrower-specific facts for each of the approximately 5.2 million PPP loans.  To the contrary, SBA here satisfied its burden of protecting the PPP loan amounts under Exemption 4 by articulating a "generic," and "categorical" justificationthat applied to the loan data in its entirety.  *Cf. Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 766 (D.C. Cir. 2000).

> **C.**     **Although There is No Need to Reach the Question, SBA Properly Assured Borrowers the Agency Would Safeguard their Proprietary and Confidential Payroll Information**

As SBA explained (Mem. 10-11), Exemption 4 "was designed to protect confidential information" where it "'would customarily not be released to the public by the person *from whom it was obtained*'" (*Forsham v. Harris*, 445 U.S. 169, 184-85 (1980) (emphasis added)), borrowers would not customarily release their average payroll amounts.  There is therefore no need for the Court to address whether SBA provided an assurance of confidentiality when receiving information from PPP borrowers.

In any event, even if the Court reaches that question, "an implied assurance of confidentiality fairly can be inferred" from SBA's conduct.  *See U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 177, 179 (1993).  The circumstances supporting such an inference include SBA's longstanding Standard Operating Procedure, the borrower application form taken as a whole (SBA Form 2483), and the significant interest in shielding PPP borrowers—in the midst of the severe economic distress giving rise to the loan program—from the additional harm that release of their confidential information would inflict.  *See* 1st Manger Decl. ¶¶ 6, 7, 105; *see also* 2d Manger Decl. ¶¶ 13-18.

Plaintiffs ignore those circumstances, and the teaching of *Landano*.  Plaintiffs instead contend (Opp. 17-19) that "SBA itself rendered Exemption 4 inapplicable" with an "explicit assurance that [confidential information] would be made public."  But that contention is predicated on isolated snippets from Form 2483's paragraph about FOIA.  The pertinent sentences on page 4 of that form read as follows:

> Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity.  Proprietary data on a borrower would not routinely be made available to third parties.

Plaintiffs' contention that SBA made an "assurance of *disclosure*" (Opp. 17 (Heading 2)) revolves around the inclusion of the "names of the borrowers" and the "amount of the loan" as items to "be automatically released" in the second of those sentences.  But Plaintiffs impermissibly discard the sentence as a whole, as well as the surrounding context.

To begin with, Plaintiffs do not attempt to address the Standard Operating Procedure, which set the table for SBA's interactions with borrowers and with the banks that actually make

the loans which SBA guarantees.  The Standard Operating Procedure for many years has committed SBA to preserving the confidentiality of payroll information.  1st Manger Decl. ¶ 95; 2d Manger Decl. ¶¶ 13-15.  The application form did not purport to override the Standard Operating Procedure. SBA borrowed the FOIA paragraph wholesale from the application form it had used for years for the pre-existing Section 7(a) loan program (Form 1919).  2d Manger Decl. ¶¶ 17-18.  SBA did not rewrite that paragraph to explicitly cover each particular distinctive feature of the PPP.  But there was no need to do so: SBA's use of boilerplate language about the Section 7(a) loans was not a commitment by the agency to cast aside the protections of Exemption 4.

Moreover, the sentence of the disclosure on which Plaintiffs fixate *itself* makes clear that it does not apply to key features of PPP loans.  For example:  The sentence states that the list of items to "be automatically released" includes "the collateral pledged to secure the loan," but PPP loans do *not* require collateral.  2d Manger Decl. ¶ 18.  By contrast, Section 7(a) loans do contain such a requirement.  Therefore, the most natural reading of this disclosure language is that it applies only to Section 7(a) loans, not PPP loans.   In other words, the sentence as a whole included a list of disclosures applicable to other SBA loan programs in addition to PPP.  Furthermore, the next sentence in the paragraph, which expressly states that SBA would not release "[p]roprietary data," further demonstrates that the form as a whole preserves confidentiality of information that the borrower itself keeps confidential but provided to SBA to obtain an emergency loan.  After all, for other Section 7(a) loans, *unlike* for PPP loans, there is no formula connecting loan amount to average payroll, so disclosure of Section 7(a) loan amounts under FOIA does not result in disclosure of borrowers' average payroll.

Even if the form can be examined using the canons of interpretation that apply to statutes as Plaintiffs claim, the reading of the form advocated for by Plaintiffs is mistaken.  Their reading

10

hinges on "isolated provisions" of Form 2483. But Plaintiffs do not properly account for the whole sentence on which they purport to rely, or related provisions in the Standard Operating Procedure. "Courts have a 'duty to construe statutes, not isolated provisions.'" *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)). And Plaintiffs also ignore the statutory context. They disrespect the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993).

### D. Statutes Outside the CARES Act Do Not Undermine SBA's Exemption 4 Withholdings

Plaintiffs are also wrong to argue that disclosures by some borrowers or agencies under legal requirements separate from the CARES Act and unrelated to PPP undermine the SBA's Exemption 4 analysis in this case.

Contrary to Plaintiffs' contention (Opp. 15), annual disclosures by certain tax-exempt organizations on the Internal Revenue Service ("IRS")'s Form 990 do not change the Exemption 4 analysis. To begin with, not all tax-exempt organizations file Form 990. 2d Manger Decl. ¶ 20 (citing 26 U.S.C. § 6033(a)(3)(A); 26 C.F.R. 1.6033-2(g)(1)). And even if it were the case (which it is not) that certain tax-exempt PPP borrowers—a mere fraction—must disclose their average payroll through Form 990, that would not warrant summary judgment to Plaintiffs, requiring the public disclosure of the loan data for *all* borrowers. 2d Manger Decl. ¶ 22.

In any event, Plaintiffs' assertion about what IRS Form 990 discloses is incorrect. 2d Manger Decl. ¶ 21 (citing 26 U.S.C. § 6033(b)(7)). Form 990 requires, among other things, certain nonprofit organizations to report the compensation of their (1) current officers, directors, and trustees (no minimum compensation threshold); (2) current key employees (those who earn more

11

than $150,000 of reportable compensation); (3) current five highest compensated employees who are not officers, directors, trustees, or key employees;  (4) former officers, key employees, and highest compensated employees (who earned more than  $100,000 of reportable compensation, with special rules for former highest compensated employees); and (5) former directors and trustees (who earned  more than  $10,000 of reportable compensation in the capacity as a former director or trustee).  Tax-exempt organizations, however, employ many other personnel whose compensation is not reported under Form 990, because they are neither highly paid nor part of the organization's governance.  *See id.*  Because Form 990 does not require disclosure of every (or even most) employees' compensation, disclosure under Form 990 does not make an organization's average payroll public.  Contrary to Plaintiffs' contention, Form 990 thus does not "already" place average payroll information "in the public record."

Plaintiffs fare no better in contending (Opp. 19) that the confidentiality of PPP loan amounts under Exemption 4 is surrendered by federal statutes directing OMB to set certain standards for disclosure of federal agency financial information in the Federal Funding Accountability and Transparency Act of 2006 (FFATA), Pub. L. No. 109-282, 120 Stat. 1186. Plaintiffs fail to grasp that the Digital Accountability and Transparency Act (DATA Act), Pub. L. No. 113-101, 128 Stat. 1146, amended FFATA.  Under the DATA Act, agencies report on financial and non-financial data following standards set by the U.S. Department of the Treasury and OMB, and agency reported data is made available to the public on USASpending.gov, a website operated by Treasury in consultation with OMB.   But the DATA Act explicitly clarified that FOIA exemptions remain unchanged.  *See* DATA Act § 7, 128 Stat. at 1152 ("Nothing in this Act shall require the disclosure to the public of . . . information that would be exempt from disclosure under" FOIA).  SBA has properly fulfilled its responsibilities under the FFATA and the DATA Act, and

12

those statutes do not undercut SBA's Exemption 4 withholdings from Plaintiffs.  2d Manger Decl. ¶¶ 23-25.

## II.     SBA Properly Withheld the Names and Addresses of Certain PPP and EIDL Borrowers Under Exemption 6

Under Exemption 6, the SBA withheld the names and addresses of PPP borrowers that received loans of less than $150,000, and sole proprietorships or independent contractors that received EIDL loans.  *See* 1st Manger Decl. ¶¶ 106-113.  The D.C. Circuit "has often held," and Plaintiffs do not deny, "that individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information," such as the loans at issue here.  *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999); *accord Consumers' Checkbook Ctr. v. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009) ("We have consistently held that an individual has a substantial privacy interest under FOIA in his financial information . . . ."); *Judicial Watch v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006) (quoting *Lepelletier*, 164 F.3d at 47).

That same privacy interest applies to individual owners whose businesses received such loans.  "It is clear that businesses themselves do not have protected privacy interests under Exemption 6, but where their records reveal financial information easily traceable to an *individual*, disclosing those records jeopardizes a personal privacy interest that Exemption 6 protects."  *Multi AG Media v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (emphasis in original).  For that reason, "Exemption 6 applies to financial information in business records when the business is individually owned or closely held, and 'the records would necessarily reveal at least a portion of the owner's personal finances.'"  *Id.* at 1228–29 (quoting *Kleppe*, 547 F.2d 673 at 685); *see Consumers' Checkbook*, 554 F.3d at 1051 ("We have . . . recognized substantial privacy interests in business-related financial information for individually owned or closely held businesses because

13

the 'financial makeup of the businesses mirrors the financial situation of the individual family members.'" (quoting *Multi AG Media*, 515 F.3d at 1229).

Plaintiffs do not dispute that the identities of the smallest of the small businesses that received PPP loans are properly protected by Exemption 6.  But they argue that these privacy interests are minimal.

For this argument, Plaintiffs primarily rely on the language in the FOIA disclosures appended to the PPP and EIDL application forms.  As discussed at length above, the PPP language was transplanted from the pre-existing Section 7(a) loan form in the midst of a global pandemic, and cannot bear the weight that Plaintiffs would accord it.  The same forms also ensure borrowers' confidentiality.  Indeed, the EIDL form explicitly incorporates the language of Exemption 6, providing that "We do not routinely make available to third parties . . . information that would cause competitive harm or *constitute a clearly unwarranted invasion of personal privacy*."[2]  Read as a whole, the application forms do not diminish individuals' privacy interests.

Plaintiffs also point to two cases in which agencies sought to withhold the identities of public commenters.  *See Prechtel v. FCC*, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (commenters on "net neutrality" rule); *All. for the Wild Rockies v. Dep't of the Interior*, 53 F. Supp. 2d 32, 37 (D.D.C. 1999) (commenters on reintroduction of grizzly bears into the Bitterroot mountains).  But to release the identities of individuals who comment on agency rulemakings is not to reveal anything especially private about them.  By contrast, to reveal the identities of PPP borrowers is to reveal aspects of their financial circumstances—most importantly, the simple fact of a recent

---

[2] The EIDL application form is available at https://www.sba.gov/sites/default/files/articles/ SBA_Form_3501_Economic_Injury_Disaster_Loan_Application.pdf.  The FOIA disclosure appears on page 12 of the PDF; the emphasis is added.

loan at a time when many businesses have been forced to choose which creditors to pay.  As SBA noted in its opening brief, it has already received FOIA requests from landlords seeking to know whether their tenants received PPP funds, *see* 1st Manger Decl. ¶ 109, presumably so that they could attempt to collect any unpaid rent.  The privacy interest in that information is quite substantial.

Plaintiffs nonetheless question PPP borrowers' interests in avoiding unwanted solicitations, which they describe as "commercial mailings directed at . . . business needs," which businesspeople "can be expected to handle . . . with equanimity."  Opp. 22 (quoting *Wash. Post Co. v. U.S. Dep't of Agric.*, 943 F. Supp. 31, 35 (D.D.C. 1996)).  Plaintiffs' attempt to marshal a single district court case against a line of D.C. Circuit precedent cannot succeed.  *Cf. Lepelletier*, 164 F.3d at 47; *Painting & Drywall Pes. Fund v. Dep't of Hous. & Urban Dev.*, 936 F.2d 1300, 1303 (D.C. Cir. 1991); *NARFE v. Horner*, 879 F.2d 873, 876 (D.C. Cir. 1989).  And in any event, Plaintiffs miss the point—which is not that PPP borrowers might be beset with "commercial mailings," but rather that creditors and competitors would learn sensitive information about the finances of the borrowers.  The public would also learn that PPP borrowers felt the loans were "necessary . . . to support . . . ongoing operations" given "the uncertainty of current economic conditions."  *See* 15 U.S.C. § 636(a)(36)(G)(i)(I).  Plaintiffs suggest that this attestation of financial vulnerability should diminish borrowers' privacy interest in protecting financial information from creditors and competitors, or vice versa.  But that rings hollow.  The fact that a business owner has received an influx of cash is sensitive information, made no less so by the fact that the infusion was necessary.

SBA does not deny that there is a public interest in understanding how public funds are deployed through the PPP and EIDL programs.  But much of that interest has been satisfied by the

15

information that is *already* publicly available.  SBA has released the identities of PPP borrowers with loans above $150,000, who account for almost 75% of all PPP funds loaned.  __2d Manger Decl. ¶ 30.  It has published detailed information about each of the loans for which it has withheld the borrower's name and address.  1st Manger Decl. ¶ 88.  And SBA has committed to review all PPP loans greater than $2 million—in addition to other PPP loans, as appropriate—to ensure that PPP benefits only eligible borrowers.  2d Manger Decl. ¶ 31.  The question for the Court is whether the public interest in the information *actually withheld* under Exemption 6 outweighs the privacy interests of the borrowers.

Plaintiffs can muster only two examples to argue that it does.  First, Plaintiffs note that the Associated Press was unable to determine "the total amount of PPP funds the Catholic Church obtained," Opp. 27, though they do not explain why that question is of greater public moment than borrower privacy.  (It is clear from Plaintiffs' argument that the public already knows that the Catholic Church received PPP funding.)  And second, Plaintiffs assert a public interest in "the 'precise number' of minority-owned businesses receiving PPP loans in Minnesota." *Id.*  But the SBA has already released demographic data for PPP loans, and the release of borrower identities for the smallest loans would not enable the public to determine which businesses receiving PPP loans were minority-owned.  1st Manger Decl. ¶¶ 88-89.  In other words, as a result of SBA's disclosures, requesters already have a significant amount of information about lending activity under the CARES Act, which supports the agency's balancing of the competing interests.  The paucity of Plaintiffs' examples belies their argument that a great public interest would be further served by releasing the names of the smallest PPP borrowers, and the sole proprietorships or independent contractors that received EIDL loans.

16

The SBA's withholding of this information to protect the privacy of the borrowers is amply justified by its declarations, and authorized under FOIA Exemption 6.

## III.    SBA Has Provided Specific Reasonably Foreseeable Harms That Would Result from Disclosure for All Withholdings

In three paragraphs at the end of their brief, Plaintiffs contend that SBA cannot "reasonably foresee[] that disclosure" of the information withheld "would harm an interest protected by" Exemption 4 or 6.  *See* 5 U.S.C. § 552(a)(8)(A)(i).  For the reasons set out above and in SBA's opening brief, that is incorrect.  It is reasonably foreseeable that disclosure of the information withheld under Exemption 4 would cause harm by revealing the confidential payrolls of PPP borrowers.  And it is equally foreseeable that revealing the identities of the smallest PPP borrowers and certain EIDL borrowers would harm their privacy interests by publicizing their finances—a harm that Exemption 6 protects against.

Congress made clear that the FOIA Improvement Act "does not alter the scope of information that is covered under an exemption."  H.R. Rep. No. 114-391, at 10 (2016).  As explained above, the withheld information is covered under an exemption, and the harms that would flow from its release are easily foreseeable.

17

\*      \*      \*      \*      \*

For the foregoing reasons, and for those in the opening memorandum, the Court should grant

summary judgment to SBA and against Plaintiffs on the claims in the Amended Complaint.

Dated:  September 22, 2020                          Respectfully submitted,

 JEFFREY BOSSERT CLARK                      **/s/  INDRANEEL SUR**
 Acting Assistant Attorney General           INDRANEEL SUR
                                              JAMES BICKFORD
 ELIZABETH J. SHAPIRO                         Trial Attorneys
 Deputy Branch Director
                                              Federal Programs Branch,
                                              Civil Division
                                              United States Department of Justice
                                              P.O. Box 883
                                              Washington, D.C. 20044
                                              Telephone:  (202) 616-8448
                                              E-mail:      Indraneel.Sur@usdoj.gov

18