**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**WP COMPANY LLC**
**d/b/a THE WASHINGTON POST, et al.**,

Plaintiffs,

v.

**U.S. SMALL BUSINESS ADMINISTRATION**,

Defendant.

Case No. 1:20-cv-1240-JEB

Oral Argument Requested

**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Kristel Tupja (#888324914)
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
tupjak@ballardspahr.com

*Counsel for Plaintiffs*

Dated:  September 29, 2020

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.      THE SBA CANNOT WITHHOLD LOAN DATA UNDER EXEMPTION 4 ................... 3

      A.     The Loan Data Does Not Reveal Any Information That Is
           Customarily And Actually Treated As Private ........................................................ 3

           1.     Non-profit groups already disclose the data the SBA
                 seeks to protect ............................................................................................ 3

           2.     The Loan Data would not actually reveal borrowers'
                 average payrolls ........................................................................................... 5

      B.     The Loan Data Was Not Provided Under An Assurance Of Privacy ...................... 7

II.     THE SBA CANNOT WITHHOLD LOAN DATA UNDER EXEMPTION 6 ................. 10

III.    THE SBA HAS NOT SATISFIED THE FORESEEABLE HARM
      STANDARD .................................................................................................................. 14

CONCLUSION .................................................................................................................... 14

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Department of the Interior*,
  53 F. Supp. 2d 32 (D.D.C. 1999) ............................................................................................11

*American Immigration Lawyers Association v. Executive Office*
  *for Immigration Review*,
  830 F.3d 667 (D.C. Cir. 2016) ...............................................................................................10

*Flightsafety Services Corporation v. Department of Labor*,
  326 F.3d 607 (5th Cir. 2003) .....................................................................................................5

*Food Marketing Institute v. Argus Leader Media*,
  139 S. Ct. 2356 (2019)...............................................................................................................3

*Judicial Watch, Inc. v. Department of Commerce*,
  375 F. Supp. 3d 93 (D.D.C. 2019) ..........................................................................................14

*Maydak v. Department of Justice*,
  218 F.3d 760 (D.C. Cir. 2000)...................................................................................................7

*Multi AG Media LLC v. Department of Agriculture*,
  515 F.3d 1224 (D.C. Cir. 2008) ..............................................................................................13

*Prechtel v. FCC*,
  330 F. Supp. 3d 320 (D.D.C. 2018) ........................................................................................11

*Public Citizen, Inc. v. OMB*,
  598 F.3d 865 (D.C. Cir. 2009) ..................................................................................................3

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)....................................................................................................................9

**Statutes**

31 U.S.C. § 6101....................................................................................................................................10

## PRELIMINARY STATEMENT

In its Opposition ("Opp."), the SBA concedes the falsity of the factual premises it relies on to withhold the identities of and amounts borrowed by the recipients of more than half a trillion taxpayer dollars through the PPP and EIDL programs.  The forms, regulations, statutes, and precedent that the SBA cites, and the public interest that has only grown since this litigation began, all favor the release of this "Loan Data" to Plaintiffs and the public.

First, the SBA now acknowledges that "[b]usinesses that pay salaries of greater than $100,000 received PPP loans" and that "PPP borrowers did not all receive the maximum loan amount available to them," *see* SBA's Resp. to Pls.' Statement of Undisputed Material Facts ("SBA's Resp. SUMF") at ¶¶ 18-19, Dkt. 20-1.  The SBA's admissions thus undercut its entire Exemption 4 rationale that the Loan Data would reveal "average payroll" information, because in making that claim the agency assumes precisely the opposite, that borrowers paid salaries of no more than $100,000 and took out the maximum loans.  *See* Opp. at 7-8.

Second, the SBA asks the Court to overlook its own PPP application and instead look to its Standard Operating Procedure ("SOP"), even though that document also lists "names . . . of recipients of approved loans" and "amounts of loans" as information generally disclosed under the Freedom of Information Act ("FOIA"), *see* Ex. Q to the Decl. of William Manger ("Manger Decl."), Dkt. 15-2 at 55.  Moreover, the SBA's claim that it errantly included the transparency language in the PPP application form (*i.e.*, that "[i]nformation about approved loans will be automatically released," including "the names of the borrowers" and "the amount of the loan"), because it hastily copied "boilerplate" from another program's application form, supports more scrutiny – not less – in the administration of this $525 billion aid program.  *See* Opp. at 2, 10. The SBA therefore cannot justify its claim that the Loan Data is confidential under Exemption 4

1

or that the public interest is outweighed by the borrowers' private interests under Exemption 6.

Third, the government's own enhanced concerns about the administration of the SBA loan program demonstrate the public interest in the Loan Data. The Justice Department has already opened dozens of cases for alleged PPP-related crimes, and the SBA's own Inspector General calls these prosecutions "the smallest, tiniest piece of the tip of the iceberg." *See* Stacy Cowley, *Spotting $62 Million in Alleged P.P.P. Fraud Was the Easy Part*, The New York Times, Aug. 28, 2020, https://www.nytimes.com/2020/08/28/business/ppp-small-business-fraud-coronavirus.html at 1-2. Indeed, just days after Plaintiffs filed their opening brief ("Br."), the Department's Criminal Division held a press conference on "PPP Criminal Fraud." Prosecutors announced charges against PPP borrowers for spending taxpayer dollars "on things like luxury cars, homes, renovations, jewelry – and even adult entertainment and gambling in Las Vegas," and acknowledged that "any time the federal government makes a large amount of money available to the public on an expedited basis, the opportunities for fraud are clear."[1] In light of these official allegations that the program has been abused, the SBA's argument that the public interest is "satisfied" because the SBA plans "to review all PPP loans greater than $2 million" and "other PPP loans, as appropriate," is simply inadequate. *See* Opp. at 16. The SBA's vague promise of oversight rings especially hollow as loans of greater than $2 million, the threshold for scrutiny that the SBA selected, represent only 0.6% of all loans made under the PPP. Thus, even under the SBA's assurances, the vast majority of PPP loans would receive no government scrutiny. Again, the public's need to monitor waste, fraud, and abuse, in a program that

---

[1] *See Acting Assistant Attorney General Brian Rabbitt Delivers Remarks at the PPP Criminal Fraud Enforcement Action Press Conference: Remarks as Prepared for Delivery*, Dep't of Justice, Sept. 10, 2020, https://www.justice.gov/opa/speech/acting-assistant-attorney-general-brian-rabbitt-delivers-remarks-ppp-criminal-fraud.

prosecutors already have identified as vulnerable to rampant criminal conduct, outweighs any private interests under Exemption 6.

In light of the SBA's groundless confidentiality and privacy objections, and the compelling public interest in disclosure of these records, the Court should order the SBA to promptly release the Loan Data in full and award Plaintiffs their costs and reasonable attorneys' fees.

## ARGUMENT

The SBA fails to rebut FOIA's "presumption in favor of disclosure" that underlies FOIA's objective "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2009) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)).  The SBA also fails to carry the burden, under the FOIA Improvement Act of 2016, to show that any harm from releasing the Loan Data is not simply possible, but is reasonably foreseeable.

## I.   THE SBA CANNOT WITHHOLD LOAN DATA UNDER EXEMPTION 4.

The SBA's Opposition undermines its Exemption 4 claim and fails to rebut Plaintiffs' argument that the Loan Data does not satisfy either part of the Exemption 4 test – *i.e.*, that for "commercial or financial information" to indisputably be "confidential" under that exemption, it must have been "both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).

### A.   The Loan Data Does Not Reveal Any Information That Is Customarily And Actually Treated As Private.

#### 1.   *Non-profit groups already disclose the data the SBA seeks to protect.*

As Plaintiffs have pointed out, the SBA maintains that if it "release[d] the borrowers'

identities and PPP loan amounts, the public and competitors could attribute average payroll information to particular borrowers," Opp. at 6, yet the tens of thousands of non-profit groups that borrowed PPP funds generally make that information public on their IRS Form 990s.  Br. at 15.  While the SBA informs the Court that "Form 990 does not make an organization's average payroll public," Opp. at 11-12 (citing Second Manger Decl. ¶ 21, in turn citing 26 U.S.C. § 6033(b)(7)), the form's first page requires a non-profit to furnish its total "[s]alaries, other compensation, [and] employee benefits."  *See* Form 990, https://www.irs.gov/pub/irs-pdf/f990.pdf, at 1 line 15.  That information is drawn from Form 990 Part IX, which requires an organization to report its total payroll, the very information the SBA says is not public.  The smaller subset of compensation disclosures to which the SBA's declarant refers – the non-profit's officers, key employees, highest paid staff, etc. – is found in Form 990 Part VII.

For example, Carnegie Hall, a non-profit, received a PPP loan of between $5 and $10 million.  *See* Christian Berthelsen, *Carnegie Hall Is Among Cultural Sites That Got PPP Aid*, Bloomberg, July 6, 2020, https://www.bloomberg.com/news/articles/2020-07-06/carnegie-hall-whitney-museum-and-s-f-symphony-got-ppp-loans.  On its latest public Form 990, Carnegie Hall lists total "[s]alaries, other compensation, [and] employee benefits" for the current year as $48,276,831.  *See* Form 990, Carnegie Hall Corp., Feb. 25, 2019, at 1 line 15, *available at* https://projects.propublica.org/nonprofits/display_990/131923626/05_2019_prefixes_06-13%2F131923626_201806_990_2019051316293975.  That figure encompasses the more than $5 million in compensation Carnegie Hall paid to current officers, directors, trustees, and key employees, as well as the more than $30 million in compensation paid in "[o]ther salaries and wages."  *See id.* at 10 (Part IX) lines 5-10.

Because the public already knows the amount of Carnegie Hall's and tens of thousands of

other non-profits' total payroll from the Form 990, which requires that public disclosure, the

SBA cannot justify withholding the size of PPP loans for non-profits on the faulty premise that it

needs to safeguard that data from disclosure under FOIA.

2. *The Loan Data would not actually reveal borrowers' average payrolls.*

The SBA has demonstrated that any connection between payroll information and loan

size is fallacious even for businesses that do treat their average payroll as private.[2]  The SBA

merely "*assumes* that a borrower took out a loan for the maximum amount allowed" and also

"*assum[es]* . . . that a PPP borrower would pay few if any of its employees more than $100,000."

Opp. at 6-7 (emphasis added).  It is now beyond dispute, however, that PPP borrowers in fact

took less than the maximum and in fact paid more than $100,000 in salary.  *See* SBA's Resp.

SUMF at ¶¶ 18-19 (admitting that "PPP borrowers did not all receive the maximum loan amount

available to them" and that "[b]usinesses that pay salaries of greater than $100,000 received PPP

loans").  The SBA's assumptions are therefore concededly false.

The SBA supports its supposition by arguing that the PPP application "steered borrowers

to calculate the maximum loan amount available to them and thus to request that amount."  Opp.

at 7.  But the SBA does not say how many borrowers took less than the amount to which they

were "steered."  And while some businesses may have "had an obvious reason" to borrow

greatly at a time of economic distress, *see id.*, others also had an obvious reason not to take too

much.  The SBA will forgive loans only to a business that expends sufficient funds on designated

---

[2] The SBA criticizes Plaintiffs for "declin[ing] to address" *Flightsafety Services Corporation v. Department of Labor*, 326 F.3d 607 (5th Cir. 2003), which the SBA cites for the proposition that "Exemption 4 protects 'information regarding salaries and wages,'" Opp. at 6, but that point is not in question here.  Plaintiffs do not contest that an individual for-profit business's payroll information can be confidential under Exemption 4; Plaintiffs dispute that the Loan Data reveals payroll information in the first place.

budget items.  Businesses that over-borrowed and were unable to hit those spending thresholds risk losing out on loan forgiveness.  *See* Br. at 16.  The SBA provides no sound basis for its argument that enough borrowers maxed-out their loans such that disclosing the entire program's Loan Data reasonably risks disclosure of an individual business's confidential information.

    As to the salary thresholds, the SBA similarly tries to shore up its assumption by mis-citing its own evidence to assert that "the vast majority of PPP borrowers have no employees who earn more than $100,000 per year."  Opp. at 8 (citing Second Manger Decl. ¶¶ 11-12).  What that declaration actually says, however, is that "[b]ased on available W-2 data, the Department of Treasury estimates that 77% of *all* small businesses do not have any employees whose salary exceeds $100,000," and that "by implication" this figure applies for PPP borrowers.  Second Manger Decl. ¶ 10 (emphasis added).  The SBA thus assumes it can treat PPP borrowers as representative of all small businesses, even though businesses with existing ties to banks likely had easier access to PPP loans.  *See, e.g.*, Haoyang Liu and Desi Volker, *Where Have the Paycheck Protection Loans Gone So Far?*, Fed. Reserve Bank of New York: Liberty Street Economics, May 6, 2020, https://libertystreeteconomics.newyorkfed.org/2020/05/where-have-the-paycheck-protection-loans-gone-so-far.html ("Our interpretation is that banks' preference for their own customers causes the PPP to favor firms with existing lending relationships."); Ruth Simon & Peter Rudegeair, *In Race for Small-Business Loans, Winning Hinged on Where Firms Bank*, The Wall Street Journal, Apr. 20, 2020, https://www.wsj.com/articles/in-race-for-small-business-loans-winning-hinged-on-where-firms-bank-11587410421 ("Whether a firm made the cut often came down to how and where it banked.").  To the extent that businesses with ties to banks may tend to pay higher salaries than those without such connections, the SBA offers no reason to presume that "the vast majority" of PPP borrowers pay salaries of under $100,000.

Resting on these faulty premises, SBA's argument is unsustainable.  The SBA itself demonstrates this through its appeal to speculation.  No member of the public looking at the Loan Data would be able to ascertain a specific business's confidential payroll data, as they would have no way to know whether a specific borrower took less than the maximum amount for its loan, paid salaries of over $100,000, or both.  The Court therefore should overrule SBA's argument under FOIA Exemption 4.[3]

**B.      The Loan Data Was Not Provided Under An Assurance Of Privacy.**

In addition to the SBA's failure to satisfy the Exemption 4 requirement that the information must be "customarily and actually treated as private by its owner," the SBA also fails to demonstrate that the information was "provided to the government under an assurance of privacy" under the *Argus Leader* test.  Despite the SBA's efforts to avoid the concession, the record is clear that the Loan Data was not provided to the SBA under an "assurance of privacy." Instead, it was provided with a guarantee of disclosure.

The PPP application told borrowers that "[i]nformation about approved loans will be *automatically released*," including "the names of the borrowers" and "the amount of the loan." *See* SBA, *Paycheck Protection Program Borrower Application Form*, https://www.sba.gov/sites/default/files/2020-07/PPP-Borrower-Application-Form-508.pdf at 4 (emphasis added).  The relevant portion of the form, near the top of page 4, appears as follows:

---

[3] The SBA mis-cites precedent in arguing that the agency "satisfied its burden of protecting the PPP loan amounts under Exemption 4 by articulating a 'generic,' and 'categorical' justification that applied to the loan data in its entirety."  Opp. at 8 (citing *Maydak v. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000)).  *Maydak* does not support an Exemption 4 claim based on a generic showing; rather, it recognizes that the government "satisfies its burden of proof under Exemption 7(A) by grouping documents in categories and offering generic reasons for withholding the documents in each category" and observes that "other exemptions" not including Exemption 4 can be satisfied "through generic, categorical showings" as well.  *Maydak*, 218 F.3d at 765-66 (emphasis added) (identifying cases addressing Exemptions 3, 5, 7(C), and 7(D)).

7

**Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties. All requests under this Act are to be addressed to the nearest SBA office and be identified as a Freedom of Information request.

The EIDL application likewise stated that FOIA generally requires the SBA to release

"information such as names of borrowers" and "loan amounts at maturity." *See* SBA, *COVID-19*

*Economic Injury Disaster Loan Application*,

https://www.sba.gov/sites/default/files/articles/SBA_Form_3501_Economic_Injury_Disaster_Lo

an_Application.pdf at 12.  The SBA could not have told borrowers more clearly that the Loan

Data would be made public, not kept private.

The SBA nonetheless maintains – again, contrary to its own proofs – that "'an implied

assurance of confidentiality fairly can be inferred'" from its actions.  Opp. at 9 (quoting *Dep't of*

*Justice v. Landano*, 508 U.S. 165, 179 (1993)).  The SBA principally argues that "[t]he

application form did not purport to override the [SBA's] Standard Operating Procedure," which

"for many years has committed SBA to preserving the confidentiality of payroll information."

Opp. at 10.  In particular, Mr. Manger cites Appendix C of the current SOP as "includ[ing]

among information generally exempt from disclosure the payroll information of businesses."

Second Manger Decl. ¶ 13; Manger Decl., Ex. Q at 54.  The SBA therefore argues that a

borrower unsure whether its name and loan amount might be disclosed would look past the four-

page PPP application itself and rely on a statement made in a separate document, the SOP.

The SBA fails to mention, however, that on the very next page of the SOP, it lists

"[n]ames and commercial street and email addresses of recipients of approved loans" and

"[k]inds and amounts of loans" under the heading, in all capital letters, "INFORMATION

GENERALLY DISCLOSED."  *See id.* at 55.  The SOP further states that "[a]pproved loan

recipients, amounts and dates" are "information [that] *usually* is not granted Exemption 4

8

protection." *See id.* at 24-25 (emphasis in original).  Even if the Court would expect borrowers to consult the SOP in reviewing the PPP application form, and calibrate their expectations about public disclosure of the Loan Data, the SOP supports Plaintiffs' position that the information was presumptively public.

The SBA also illogically insists that "the most natural reading" of the explicit disclaimer – stating that "the names of the borrowers" and "the amount of the loan" will be "automatically released" – instead tells borrowers that their names and loan amounts will be kept secret.  Opp. at 10.  According to the SBA, because the disclaimer text also states that "collateral pledged to secure the loan" will be made public, and "PPP loans do not require collateral," potential borrowers will assume the disclaimer "applies only to Section 7(a) loans, not PPP loans."  *Id.* (emphasis omitted).  The SBA therefore assumes that PPP borrowers would recognize the PPP form's reference to "collateral" as inapt, would be aware of the 7(a) loan program, and would cross reference the plain language of the PPP form they are instructed to complete with a 7(a) loan application form that they do not need to complete.[4]  Rather than a "natural" reading, the SBA urges that the Court, and borrowers, traverse through its various programs and applications to arrive at an unnatural reading of the PPP form itself.

As Plaintiffs additionally argued in their opening brief (Br. at 19), the idea that the SBA "implicitly" assured borrowers the Loan Data would be kept confidential is further weakened by

---

[4] Likewise, because the application notes that the SBA will not disclose undefined "[p]roprietary data," the SBA claims that applicants will view borrower names and loan amounts as proprietary data to be kept confidential.  *Id.*  That argument continues to ignore the commonsense interpretative principle that the specific controls the general.  Br. at 18-19.  The disclaimer states that names and loans amounts specifically will be disclosed and that proprietary data generally will be kept private.  The most natural reading of the disclaimer is that names and loan amounts will, in fact, be disclosed.  *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("To eliminate the contradiction, the specific provision [must be] construed as an exception to the general one.").

the Federal Funding Accountability and Transparency Act of 2006.  The statute provides that the Office of Management and Budget "shall" disclose the "name of the entity receiving the award" and "the amount of the award" for "[f]ederal award[s]" of $25,000.00 or more, where "[f]ederal award" is defined specifically to include "loans . . . and other forms of financial assistance." 31 U.S.C. § 6101 note § 2(a)(4) & (b)(1).  The SBA responds that the law does not require the disclosure of information exempt under FOIA, *see* Opp. at 12, but that simply begs the question. The relevant point is that this statute on its face weighs against any "implicit" message from the SBA that borrowers' names and loan amounts would be kept private.

The SBA did not receive the Loan Data under an assurance of privacy, whether explicit or implicit.  Rather, the SBA received the Loan Data under an assurance of disclosure: the application forms themselves and the agency's SOP state outright that borrowers' names and loan amounts will be public record.  The SBA thus cannot satisfy either element of the *Argus Leader* test, and it cannot justify withholding the Loan Data under Exemption 4.[5]

## II.     THE SBA CANNOT WITHHOLD LOAN DATA UNDER EXEMPTION 6.

The SBA likewise fails to carry its burden under Exemption 6 to show that releasing the Loan Data "would rise to the level of a clearly unwarranted invasion of personal privacy" when balanced against "the public interest in disclosure."  *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016) (internal marks and citations omitted).  The privacy interest, if any, is minimal, and the public interest is mammoth.

On the privacy issue, the SBA emphasizes that the D.C. Circuit recognizes a privacy interest "in connection with financial information" as a general matter, Opp. at 13, but Plaintiffs

---

[5] To be sure, even if the SBA had made an assurance of confidentiality to borrowers, the first *Argus Leader* element still would require disclosure of the Loan Data.

have shown that in these particular circumstances PPP and EIDL borrowers have no reasonable expectation of privacy in the Loan Data.  Br. at 20-21.  As discussed above, the SBA expressly notified borrowers that their names and loan amounts would be disclosed.  *See supra* at 7-9.  In analogous circumstances courts have concluded that such a notification diminishes (or eliminates) any reasonable expectation of privacy under Exemption 6.  *See* Br. at 21-22 (citing *Prechtel v. FCC*, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) and *All. for the Wild Rockies v. Dep't of the Interior*, 53 F. Supp. 2d 32, 37 (D.D.C. 1999)).  The SBA attempts to distinguish these decisions by asserting that "to release the identities of individuals who comment on agency rulemakings is not to reveal anything especially private about them."  Opp. at 14.[6]  But the SBA dodges the point: whatever the individual's privacy interest in the abstract, the precedent teaches that the interest diminishes or disappears entirely when information is provided to the government despite notice that the agency will disclose it to the public.  *See* Br. at 21-22 (citing *Prechtel*, 330 F. Supp. 3d at 329; *All. for the Wild Rockies*, 53 F. Supp. 2d at 37).  Borrowers took out these loans being told, in no uncertain terms, that their names and loan amounts would be made public.

The SBA errs on the public interest side of the scale as well.  According to the SBA, the public already has ample information about these unprecedented financial assistance programs, *see* Opp. at 15-17, but the SBA's arguments on this point are baseless.  The SBA states that it has "released the identities of PPP borrowers with loans above $150,000, who account for almost

---

[6] Interestingly, while the government distinguishes the *Prechtel* precedent on this basis, in actually litigating that case, it took the opposite position, arguing there that the individuals submitting comments on the rulemaking "have a substantial privacy interest" in the requested information.  *See* Def.'s Opp. to Pl.'s Mot. for Summ. J. at 4, *Prechtel v. FCC*, No. 1:17-cv-1835-CRC (D.D.C. June 18, 2018), Dkt. 25.

75% of all PPP funds loaned," *id.* at 16, but loans of less than $150,000 make up 87% of all PPP

loans, *see* SBA, *Paycheck Protection Program (PPP) Report: Approvals through Aug. 8, 2020*,

https://www.sba.gov/sites/default/files/2020-08/PPP_Report%20-%202020-08-10-508.pdf at 6.

Moreover, the SBA has pledged to review only PPP loans for more than $2 million (and others

"as appropriate"), Opp. at 16, leaving the overwhelming majority of PPP loans, and thus the

lion's share of all borrowers, subject to neither agency nor public oversight.

      The SBA also disputes that Loan Data would enable the press and the public to monitor

whether taxpayer funds have been distributed fairly and equitably, stating that "the SBA has

already released demographic data for PPP loans."  Opp. at 16 (citing Manger Decl. ¶¶ 88-89).

But as the Government Accountability Office noted in a report published just one day before the

SBA filed its Opposition in this case:

> The loan-level data that SBA provided include limited demographic data on
> borrowers, as SBA did not ask for demographic information on the PPP loan
> application.  According to SBA officials, SBA does not have the legal authority to
> require a borrower to submit demographic data on a loan application.  In a May
> 2020 report, the SBA Office of Inspector General noted that SBA did not request
> optional demographic information on the PPP loan application and suggested that
> the agency (1) revise the borrower application to request these optional data and
> (2) include optional demographic information on the loan forgiveness form.  SBA
> did not revise the borrower application to collect such information in an effort to
> streamline the application process, according to agency officials.  **Consequently,
> information was not reported for business owners' race for 90 percent of
> approved loans, gender for 79 percent of approved loans, and veteran status
> for 85 percent of approved loans.**

*See COVID-19: Federal Efforts Could Be Strengthened by Timely and Concerted Actions*, GAO,

Sept. 21, 2020, https://www.gao.gov/reports/GAO-20-701/ (emphasis added).  The SBA has thus

failed to make this information available, and by withholding the Loan Data it has prevented the

press and public from finding out the information for itself.  Nor can the SBA plausibly argue

that "release of borrower identities for the smallest loans would not enable the public to

determine which businesses receiving PPP loans were minority-owned." *See* Opp. at 16.  Of course, journalists regularly cross-reference publicly available data to supplement and augment the government's self-reporting, all for the public benefit.[7]

      Even more remarkable than what the SBA says, however, is what the agency ignores. The words "waste" and "fraud" and "abuse" are found nowhere in the SBA's Opposition, and they receive just a single passing mention in SBA's proofs.  *See* Second Manger Decl. ¶ 29.  As noted, however, the Justice Department has begun dozens of prosecutions for alleged PPP-related crimes, and the SBA's Inspector General calls these cases "the smallest, tiniest piece of the tip of the iceberg."  *See supra* at 2.  As the Department stated, "The money these defendants stole was taxpayer money.  Every dollar received was a dollar drawn from the American people's account.  Even worse, every dollar they took was a dollar set aside to help our fellow Americans weather one of the worst national crises in recent history."  *See supra* note 1.  It is for this reason that the D.C. Circuit recognizes "a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits."  *Multi AG Media LLC v. Dep't of Ag.*, 515 F.3d 1224, 1232 (D.C. Cir. 2008).

      The SBA cannot justify withholding the Loan Data under Exemption 6.  The public interest in this information is enormous and the privacy risk from its release is minimal at most.

---

[7] *See, e.g.*, Craig Whitlock, *At War With The Truth*, The Washington Post, Dec. 9, 2019, https://www.washingtonpost.com/graphics/2019/investigations/afghanistan-papers/afghanistan-war-confidential-documents/ (reporting based on interviews and data gathered to supplement FOIA disclosures by the Special Inspector General for Afghanistan Reconstruction); Katelyn Polantz et al., *Highlights from the new Mueller FBI investigation documents*, CNN, Feb. 11, 2020, https://www.cnn.com/2020/01/02/politics/mueller-investigation-documents/index.html (reporting based on interviews and observations to supplement FOIA disclosures by the Department of Justice).

### III.   THE SBA HAS NOT SATISFIED THE FORESEEABLE HARM STANDARD.

In the wake of the FOIA Improvement Act of 2016, withholding public records now requires "more than speculation" that their release will harm some interest protected by a FOIA exemption.  *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100-01 (D.D.C. 2019).  Instead, an agency must show that the harm "is reasonably foreseeable" and must articulate "the link between this harm and the specific information contained in the material withheld."  *Id.*  The SBA has failed this test.  The agency's speculative arguments discussed above cannot even pass the baseline for withholding records under FOIA, let alone satisfy the enhanced "foreseeable harm" standard that now governs this action.

### <u>CONCLUSION</u>

For the foregoing reasons and those stated in their opening brief, Plaintiffs respectfully request that their cross-motion for summary judgment be granted, that the SBA's motion for summary judgment be denied, that the SBA be ordered to promptly disclose the Loan Data in full, and that Plaintiffs be awarded their costs and reasonable attorneys' fees incurred in this action.

Dated:  September 29, 2020       Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Kristel Tupja (#888324914)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
tupjak@ballardspahr.com

*Counsel for Plaintiffs*

14