**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WP COMPANY LLC d/b/a THE WASHINGTON POST,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 20-1240 (JEB)** |
| **U.S. SMALL BUSINESS ADMINISTRATION,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

The history of this Freedom of Information Act case is straightforward.  In May 2020, Plaintiffs — a host of national news organizations — filed a lawsuit seeking the release of various data concerning the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loans (EIDL) program.  Following a round of briefing, this Court granted judgment to Plaintiffs and ordered the Small Business Administration to release the names, addresses, and precise loan amounts for successful borrowers.  Several weeks later, after a failed attempt to put the Court's Order on hold, the agency did just that.

One final matter remains: Plaintiffs' bid for attorney fees and costs.  Although the Court agrees that the news organizations are eligible for and entitled to fees, it finds that their requested sum is somewhat excessive and must be reduced by around 20%.

I.     **Background**

As past Opinions detail the full background of this suit, see WP Co. LLC v. U.S. Small Bus. Admin., Nos. 20-1240, 20-1614, 2020 WL 6504534 (D.D.C. Nov. 5, 2020) (WP I); WP Co.

LLC v. U.S. Small Bus. Admin., Nos. 20-1240, 20-1614, 2020 WL 6887623 (D.D.C. Nov. 24, 2020) (WP II), the Court need only briefly recount the facts relevant to the present Motion.

Throughout April and May 2020, the eleven Plaintiffs in this case submitted FOIA requests seeking data regarding loans approved pursuant to the PPP and EIDL program, bringing suit in this Court after SBA declined to fulfill them. WP I, 2020 WL 6504534, at *3. Although the agency eventually published some loan-level information in July, it refused, much to Plaintiffs' displeasure, to release certain key details. Specifically, SBA did not provide both dollar figures and borrower names and addresses for any PPP loan, and it adopted a similar partial-disclosure approach for EIDL data. Id. at *3–4. According to the Government, its withholdings were based on FOIA Exemptions 4 and 6, which protect, respectively, confidential commercial information and information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. Id. (citing 5 U.S.C. § 552(b)(4), (6)).

Believing those withholdings lacked merit, Plaintiffs moved for summary judgment, and this Court ultimately agreed that neither of SBA's claimed exemptions covered the requested information. Id. at *4, 9, 18. It accordingly ordered the agency to release the "names, addresses, and precise loan amounts" for all individuals and entities that had received PPP or EIDL loans during the COVID-19 pandemic by November 19, 2020. See ECF No. 22 (11/5/20 Order) at 2.

A week before that deadline, SBA moved to stay this Court's Order pending its determination of whether to appeal. WP II, 2020 WL 6887623, at *2. After issuing a temporary stay in order to consider the agency's request, the Court denied it in full, finding that "the overriding public interest" in prompt release of the withheld information rendered a stay inappropriate. Id. at *5. Although the Court put SBA's disclosure obligation on hold for another week, see id., thus providing the agency time to notice an appeal and seek a stay from the D.C.

Circuit if it so desired, the Government took neither step.  Instead, on December 1, 2020 — and no doubt to Plaintiffs' satisfaction — it publicly produced the full dataset containing the names, addresses, and precise loan amounts for millions of recipients of PPP and EIDL COVID-related loans totaling hundreds of billions of dollars.  See SBA, 120120 EIDL, EIDL Advance, and PPP Data, https://bit.ly/38RJtsR (last visited Jan. 19, 2021).

Claiming that they "substantially prevailed" in this litigation, see 5 U.S.C. § 552(a)(4)(E)(i), Plaintiffs have now filed a Motion for Attorney Fees and Costs, see ECF No. 27 (Pl. Mot.), which SBA opposes.  See ECF No. 32 (Def. Opp.).

## II.    Legal Standard

FOIA provides that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i); see Brayton v. Off. of the U.S. Trade Rep., 641 F.3d 521, 524 (D.C. Cir. 2011).  "This language naturally divides the attorney-fee inquiry into two prongs, which our case law has long described as fee 'eligibility' and fee 'entitlement.'"  Brayton, 641 F.3d at 524 (quoting Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 368–69 (D.C. Cir. 2006)).  Plaintiffs are "eligible" to receive fees if they have "substantially prevailed."  Id.; Negley v. FBI, 818 F. Supp. 2d 69, 72–73 (D.D.C. 2011).  If Plaintiffs are eligible, the Court must then "consider[] a variety of factors" to determine whether they are "entitled" to fees.  Brayton, 641 F.3d at 524–25; see also Davy v. CIA, 550 F.3d 1155, 1158–59 (D.C. Cir. 2008).  If they are both eligible for and entitled to receive fees, the Court proceeds to "analyze whether the amount of the fee request is reasonable."  Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 811 F. Supp. 2d 216, 237 (D.D.C. 2011).

**III.    Analysis**

At least some of the usual attorney-fee legwork is already in the rearview mirror here, as SBA concedes — as it must — that Plaintiffs are "eligible" to receive fees on account of their complete success in the underlying suit.  See Def. Opp. at 4; see also Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Dep't of Energy, 288 F.3d 452, 456–57 (D.C. Cir. 2002) (explaining that plaintiff is eligible for fees if it is "awarded some relief by a court," such as "a judgment on the merits") (cleaned up).  It disputes, however, whether they are "entitled" to fees, as well as — should the Court so determine — whether their claimed fees are reasonable.  The Court takes each in turn.

A.    Entitlement

The entitlement inquiry is designed to ensure that attorney fees are distributed in a manner consistent with the purpose of FOIA's fee provision, which "was not enacted to provide a reward for any litigant who successfully forces the government to disclose information it wished to withhold."  Davy, 550 F.3d at 1158 (quoting Nationwide Bldg. Maint., Inc. v. Sampson, 559 F.2d 704, 711 (D.C. Cir. 1977)).  Instead, it serves the "more limited purpose" of "remov[ing] the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation."  Id. (quoting Nationwide, 559 F.2d at 711).  In considering that purpose, the D.C. Circuit has distinguished between a "plaintiff who seeks to advance his private commercial interests and thus needs no incentive to file suit, and a newsman who seeks information to be used in a publication or the public interest group seeking information to further a project benefitting the general public."  Id.

This Court thus considers four principal factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding." Tax Analysts v. U.S. Dep't of Justice, 965 F.2d 1092, 1093 (D.C. Cir. 1992). "No one factor is dispositive," Davy, 550 F.3d at 1159, and "[t]he sifting of those criteria over the facts of a case is a matter of district court discretion." Tax Analysts, 965 F.2d at 1094.

Here, SBA wisely concedes the first three factors, see Def. Opp. at 5, and the Court agrees that they weigh in Plaintiffs' favor. The "public benefit" from the records at issue is significant, as Plaintiffs' "victory is likely to add to the fund of information that citizens may use in making vital political choices." Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (quoting Fenster v. Brown, 617 F.2d 740, 744 (D.C. Cir. 1979)); see also Morley v. CIA, 810 F.3d 841, 844 (D.C. Cir. 2016) (explaining that public benefit exists where request has "at least a modest probability of generating useful new information about a matter of public concern"). This Court has previously explained at length how the loan data would further the public's "urgent and immediate interest in assessing the results" of an unprecedented federal relief effort financed by taxpayer dollars, WP II, 2020 WL 6887623, at *3, including whether funds were distributed fairly and equitably, and without waste, fraud, and abuse. Id. at 3–5; see also WP I, 2020 WL 6504534, at *13–17. Indeed, the information disclosed as a result of this litigation has already had that effect, making possible numerous analyses regarding SBA's administration of the PPP and EIDL program. See, e.g., Stacy Cowley & Ella Koeze, 1 Percent of P.P.P. Borrowers Got Over One-Quarter of the Loan Money, N.Y. Times (Dec. 2, 2020), https://nyti.ms/3ijduon.

The second and third factors — Plaintiffs' "commercial benefit" and "interest in the records," which "are closely related and often considered together," Tax Analysts, 965 F.2d at 1093, 1095 — plainly point in the same direction.  These elements assess whether Plaintiffs have "'sufficient private incentive to seek disclosure' without attorney[] fees."  Davy, 550 F.3d at 1160 (quoting Tax Analysts, 965 F.2d at 1095).  As relevant here, they generally tip in favor of organizations that "aim to ferret out and make public worthwhile, previously unknown government information."  Id.; see also Elec. Privacy Info. Ctr., 999 F. Supp. 2d at 69.  Plaintiffs, all news organizations (several of whom are non-profits), filed this suit for precisely that common object: "gather[ing] information of potential interest to a segment of the public" and eventually "distribut[ing] that work to an audience."  Davy, 550 F.3d at 1161–62 (quoting Tax Analysts, 965 F.2d at 1095).  That purpose, moreover, was vindicated when SBA, in executing this Court's Order, published the loan data on its own website, thereby giving Plaintiffs access at the same time as the rest of the world.  See ECF No. 33 (Pl. Reply) at 1.  These organizations should "be favorably treated under FOIA's fee provision."  Davy, 550 F.3d at 1161–62; see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 820 F. Supp. 2d 39, 45 (D.D.C. 2011).

With the first three conceded factors thus in the books, SBA pins its hopes entirely on the fourth: the reasonableness of its withholding of the requested records.  This final factor requires the Court to "consider[] whether the agency's opposition to disclosure 'had a reasonable basis in law,' . . . and whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'"  Davy, 550 F.3d at 1162 (first quoting Tax Analysts, 965 F.2d at 1096, then LaSalle Extension Univ. v. FTC, 627 F.2d 481, 486 (D.C. Cir. 1980)).  Significantly, the burden remains with the agency: "The question is not whether [Plaintiffs]

ha[ve] affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [Plaintiffs] filed suit." Id. at 1163.

Unlike the first three factors, this one is not so easily resolved. To be sure, this Court decisively rejected both of the agency's claimed justifications for withholding the records at issue. In so doing, it found that the assumptions underlying SBA's argument for nondisclosure under Exemption 4 were "fundamentally flawed," and that the "significant public interest" in the loan data "dramatically outweigh[ed] any limited private interest in nondisclosure" under Exemption 6. WP I, 2020 WL 6504534, at *7, 17. On the other hand, as the Court's 40-page summary-judgment Opinion implicitly admitted, this litigation involved "a novel application" of both exemptions "and raise[d] serious legal questions and issues that d[id] not lend themselves to immediate or obvious resolution." WP II, 2020 WL 6887623, at *2. Even though the Court ultimately rejected SBA's position on the merits, therefore, one might fairly conclude that the agency had at least a "colorable or reasonable basis" for its initial determination that FOIA exempted the requested records from disclosure. Davy, 550 F.3d at 1163. "The government's decision to withhold information," after all, "may have a reasonable basis in law even if the information was ultimately not found to be exempt." People for Ethical Treatment of Animals v. NIH, 130 F. Supp. 3d 156, 165 (D.D.C. 2015); see also Morley v. CIA, 894 F.3d 389, 393 (D.C. Cir. 2018) (explaining that relevant question "is not whether the agency's legal and factual positions were correct," but rather whether they "were reasonable").

Even assuming, however, that SBA has carried its burden and that this final factor lightly tips in its favor, Plaintiffs remain entitled to fees. In the four-part "entitlement" analysis, it bears reiterating, "[n]o one factor is dispositive." Davy, 550 F.3d at 1159. Indeed, the fourth criterion

7

is necessarily decisive only when "the Government's position is correct as a matter of law."  Id. at 1162 (citation omitted).  If, on the other hand, its stance is merely "founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus."  Id.

Here, the first three factors — most notably the substantial public benefit from the released records — tilt heavily toward Plaintiffs, more than offsetting the fourth factor and confirming the news organizations' entitlement to fees.  This is particularly so where the fourth factor does not decisively land in Defendant's column.  As the D.C. Circuit itself has emphasized, "[W]hen the first three factors favor the plaintiff, but the fourth does not, a district court retains very broad discretion under the four-factor test about how to balance the factors and whether to award attorney[] fees."  Morley, 894 F.3d at 397; see also Tax Analysts, 965 F.2d at 1094.  Along those lines, numerous courts in this district have awarded fees in circumstances similar to those here.  See, e.g., Mattachine Soc'y of Wash. v. U.S. Dep't of Justice, 406 F. Supp. 3d 64, 70 (D.D.C. 2019) ("Even if the fourth factor did not weigh in [plaintiff's] favor, the Court would still find that the other three factors are sufficient to entitle [plaintiff] to fees."); Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, No. 11-1021, 2014 U.S. Dist. LEXIS 182097, at *11–12 (D.D.C. Oct. 24, 2014) ("Although [the agency's] withholdings may not have been unreasonable, the Court, weighing the factors, nonetheless finds that the other three outweigh this [fourth] factor . . . ."); see also People for Ethical Treatment of Animals, 130 F. Supp. 3d at 164 (plaintiff entitled to fees where first factor was neutral, second and third favored plaintiff, and fourth favored defendant).

This case comes out the same way.  In keeping with Congress's intention that FOIA's fee provision "encourage . . . suits that benefit the public interest," LaSalle Extension Univ., 627 F.2d at 484, Plaintiffs are entitled to attorney fees.

B.  Reasonableness of Fees

Retreating to its fallback position, SBA alternatively contends that the amount of fees Plaintiffs seek is not reasonable and should be substantially reduced.  See Def. Opp. at 8–17. "The usual method of calculating reasonable attorney[] fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount."  Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998).  "The party seeking fees has the . . . burden of establishing the reasonableness of the fees requested" and must do so for "both the number of hours and the hourly rate."  Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 218 F. Supp. 3d 27, 38, 47 (D.D.C. 2016).  Supporting documentation, such as time records reflecting the work of each attorney, "must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended."  Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C. Cir. 2004) (citation omitted).  Courts maintain broad discretion to modify a requested fee award.  See Conservation Force v. Jewell, 160 F. Supp. 3d 194, 203 (D.D.C. 2016) (citing Judicial Watch, 470 F.3d at 369).

Plaintiffs seek $154,648.27 in fees (and an additional $193.65 in costs).  See Pl. Mot. at 9.  SBA resists the first sum, challenging both their lawyers' requested hourly rates and number of hours billed.  See Def. Opp. at 8–17.  The Court separately addresses those objections.

1.   *Rates*

Whether an hourly rate is reasonable turns on: 1) "the attorney's billing practices"; 2) "the attorney's skill, experience, and reputation"; and 3) "the prevailing market rates in the relevant community."  Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015) (cleaned up) (quoting Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995)).  Particularly relevant here is the third criterion.  To establish the prevailing market rate, "a fee applicant must 'produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'"  Id. at 100 (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)).

In determining appropriate rates, courts in this district have often employed some version of the Laffey Matrix, a schedule of hourly fees based on years of attorney experience first developed in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), rev'd on other grounds, 746 F.2d 4 (D.C. Cir. 1984).  See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 142 F. Supp. 3d 1, 16 (D.D.C. 2015).  Neither party here, however, relies on that matrix; they instead advance dueling matrices from which they contend the Court should calculate fees.  Plaintiffs argue that they should be awarded fees based on what litigants call the Legal Services Index (LSI) Matrix, while SBA maintains that the Court should look to a distinct matrix published by the U.S. Attorney's Office for the District of Columbia.  See ECF No. 27-2 (LSI Matrix); Dep't of Justice, USAO Attorney's Fees Matrix — 2015-2021, https://bit.ly/3bDZog1 (last visited Jan. 19, 2021) (USAO Matrix).  While each adjusts for inflation in different ways and reflects rates from different collections of practitioners, the fees

included in the LSI Matrix are the higher of the two.  The Court's first task, consequently, is to select the appropriate matrix.

Because fee matrices are "somewhat crude," a plaintiff generally must supplement them with additional evidence such as "surveys to update the[m]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases."  DL v. District of Columbia, 924 F.3d 585, 589 (D.C. Cir. 2019) (quoting Covington, 57 F.3d at 1109).  In keeping with the well-established principle that fee-seekers bear the "burden of justifying their requested rates," Salazar ex rel. Salazar v. District of Columbia, 809 F.3d 58, 64 (D.C. Cir. 2015), the D.C. Circuit has reversed an attorney-fee award calculated from the LSI Matrix when the plaintiff's submissions did not contain "evidence that her 'requested rates [we]re in line with those prevailing in the community for similar services,' — i.e., [the] [Individuals with Disabilities Education Act] litigation" at issue. Eley, 793 F.3d at 104 (quoting Covington, 57 F.3d at 1109); id. at 105 (holding that district court improperly "reliev[ed] [plaintiff] of her burden"); see also Elec. Privacy Info. Ctr., 218 F. Supp. 3d at 48 (explaining that "the burden is on the party seeking attorney[] fees to show that the LSI Laffey Matrix should be used") (citing Salazar, 809 F.3d at 61).

A similar failure of proof rears its head here, as Plaintiffs have made little effort to establish that their preferred LSI rates are "in line with those prevailing in the community" for FOIA litigation.  Eley, 793 F.3d at 104 (quoting Covington, 57 F.3d at 1109).  For instance, they decline to explain — such as through exhibits or affidavits of the sort that typically accompany motions for attorney fees — why the methodology underlying the LSI Matrix renders it appropriate for this particular case.  See, e.g., id. at 103–04.  More glaringly, they offer no

11

evidence whatsoever — such as surveys or billing-rate tables — of rates charged and received by lawyers of comparable skill and experience in the D.C. market generally, let alone when handling FOIA cases.  See, e.g., CREW, 142 F. Supp. 3d at 17–18.  Indeed, their declarations do not even assert that their requested figures are in line with prevailing community rates for similar litigation.

Other courts in this district, when confronted with similarly insufficient showings in FOIA cases, have rebuffed attempts by attorney-fee seekers to rely on the LSI Matrix and instead have based awards on the lower USAO Matrix rates.  One did so where there was an "absence of evidence from [the plaintiff] satisfying its burden to establish that the LSI Matrix represent[ed] the prevailing rate in the relevant market."  Id. at 22.  (That plaintiff, it bears noting, presented more evidence in support of applying LSI rates than the news organizations do here.  Id. at 17–18.)  Two other decisions have recently come out the same way, with the latest settling on USAO rates because the plaintiff's "evidence . . . [was] insufficient to establish that the market rate for FOIA practitioners in Washington, D.C.[,] comports with the LSI Matrix."  Urban Air Initiative v. EPA, 442 F. Supp. 3d 301, 323 (D.D.C. 2020) (criticizing plaintiff's affidavits for "not recit[ing] 'precise fees that attorneys with similar qualifications have received' in other comparable cases") (quoting DL, 924 F.3d at 589); Barton v. U.S. Geological Surv., No. 17-1188, 2019 WL 4750195, at *6–7 (D.D.C. Sept. 29, 2019) (similar).  So too here.  In light of Plaintiffs' failure to justify the reasonableness of the LSI Matrix rates for the present litigation, and since SBA consents to application of the USAO Matrix, the Court will base the fee award on the latter.

In their Reply brief, Plaintiffs raise several belated arguments in favor of their desired LSI Matrix.  None remedies the aforementioned defects.  The news organizations first point to

recent FOIA litigation involving largely the same attorneys, where the Government consented to a fee calculation using the LSI rates (modified to include Charles D. Tobin's lower, standard hourly rate).  See Pl. Reply at 8 (citing WP Co. LLC v. U.S. Dep't of State, No. 20-1082, ECF No. 16 at 10 (D.D.C. Nov. 13, 2020)).  Contrary to Plaintiffs' implication, however, the Government's prior position in a different proceeding — one where fees were never even awarded, and where the State Department, not SBA, was the defendant — does not estop it from challenging the news organizations' distinct failure of proof here.  Although Plaintiffs cite a case that deemed a similar past agency concession "significant," that court applied the fee-seeker's desired rates primarily because it had submitted ample evidence in support of their reasonableness — evidence that is absent here.  Elec. Privacy Info. Ctr., 218 F. Supp. 3d at 49 (explaining that plaintiff met burden through affidavit from LSI Matrix's founder, as well as billing-rate tables and surveys).  Such was the case in DL, too; the litigants there demonstrated by way of evidence of a type not seen here that their preferred LSI rates were the prevailing community market rates for the legal services provided in an IDEA suit.  See 924 F.3d at 590–91 (determining that plaintiffs satisfied burden through "a pile of evidence" that included affidavits from economists, rate surveys, and fee awards in other cases).

Additional cases cited by Plaintiffs offer little succor.  One compared the propriety of LSI and USAO rates for a fee award in an "extraordinary" sex-discrimination class-action settlement that spanned 40 years and staffed over 120 individuals across seven firms — circumstances far afield from those present here.  Hartman v. Pompeo, No. 77-2019, 2020 U.S. Dist. LEXIS 204894, at *2 (D.D.C. Nov. 3, 2020).  Another — from this Court — relied heavily on the very district-court decision the D.C. Circuit eventually reversed in Eley, given the plaintiff's submission of insufficient evidence to justify the LSI rates.  See CREW, 2014 U.S. Dist. LEXIS

182097, at *22–23 (citing <u>Eley v. District of Columbia</u>, 999 F. Supp. 2d 137 (D.D.C. 2013), <u>vacated and remanded</u>, 793 F.3d 97).

Finally, Plaintiffs point to their lawyers' standard hourly billing rates — which, for all attorneys save Tobin, are slightly higher than the corresponding LSI Matrix figures — as evidence in support of applying their requested LSI rates (and Tobin's lower hourly rate).  <u>See</u> Pl. Reply at 8–9 ("[T]here is no better indication of what the market will bear than what the lawyer in fact charges for his or her services and what the clients are willing to pay.") (quoting <u>Mattachine Soc'y</u>, 406 F. Supp. 3d at 70); ECF No. 27-1 (Declaration of Charles D. Tobin), ¶ 12 (listing firm's standard hourly rates).  These standard hourly fees, however, cannot by themselves establish that Plaintiffs' "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  <u>Eley</u>, 793 F.3d at 100 (quoting <u>Blum</u>, 465 U.S. at 895 n.11).  Even if they could, their attorneys' submissions appear to convey only amounts billed, not payments received, and it is often the case that standard hourly rates overstate the fees clients actually pay for services. <u>See</u> <u>Cox v. District of Columbia</u>, 264 F. Supp. 3d 131, 140–41 (D.D.C. 2017) (deeming plaintiffs' submissions unhelpful for determining prevailing community rate because they "do not provide the specific rates that [attorneys] typically <u>receive</u>," but rather "only state how much they charge"); <u>see also</u> <u>Eley</u>, 793 F.3d at 101.  Nor, as previously discussed, do Plaintiffs offer any evidence whatsoever as to the billing practices of similarly situated attorneys handling comparable litigation, let alone the fees they actually collect.  Without more, the evidence before the Court does not establish the reasonableness of Plaintiffs' requested rates.

To take a step back: Courts in this district have ruled in various ways when determining the precise rates used to calculate fee awards in individual cases.  That is no surprise, as options

commonly range from the LSI Matrix to the USAO Matrix to some other measure entirely, and parties often "vigorously contest[]" which to apply.  Elec. Privacy Info. Ctr., 218 F. Supp. 3d at 48.  To be sure, in many federal cases involving complex legal issues, the LSI Matrix may offer a better representation of the value of the legal services provided.  It is clear, however, that the burden lies with fee-seekers to demonstrate — through specific evidence — that their requested rates accord with those prevailing in the community for similar services from comparable lawyers.  As Plaintiffs have not discharged that burden here, the Court will base its award on rates found within the USAO Matrix, thus yielding a lodestar amount of $129,789.07 in attorney fees, along with $193.65 in costs.

| Name | Title | Years of Experience | USAO Matrix Rate | Hours Billed | Fees |
|---|---|---|---|---|---|
| Charles D. Tobin | Partner | 31+ years | $665 | 52.47 | $34,892.55 |
| Maxwell S. Mishkin | Associate | 6 years | $388 | 205.18 | $79,609.84 |
| Kristel Tupja | Associate | 3 years | $369 | 22.52 | $8,309.88 |
| Scott E. Bailey | Paralegal | N/A | $180 | 28.51 | $5,131.80 |
| Ryan R. Relyea | Paralegal | N/A | $180 | 10.25 | $1,845.00 |
| **TOTAL** | | | | | **$129,789.07** |

See Pl. Mot. at 8; USAO Matrix at 1.

   2.  *Hours*

   With a new lodestar figure in tow, the Court turns from rates to time.  Or, more specifically, to SBA's objections to Plaintiffs' billing entries, several types of which the agency terms "duplicative or excessive."  Def. Opp. at 12.  In so doing, the Court is mindful that "'trial courts need not, and indeed should not, become green-eyeshade accountants' in examining fee requests since '[t]he essential goal . . . is to do rough justice, not to achieve auditing perfection.'"  Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency, 87 F. Supp. 3d 223, 235 (D.D.C. 2015) (first alteration in original) (quoting Fox v. Vice, 563 U.S. 826, 838 (2011)).  "The Court therefore

need not — and should not — scrutinize every billing entry." <u>Am. Oversight v. U.S. Dep't of Justice</u>, 375 F. Supp. 3d 50, 70 (D.D.C. 2019).  It must, however, "verify that the attorneys did not waste or otherwise unnecessarily spend time on the matter and exercised good billing judgment." <u>Elec. Privacy Info. Ctr.</u>, 811 F. Supp. 2d at 237 (cleaned up) (citations omitted).  The Court, accordingly, will address the asserted excesses in Plaintiffs' billing entries in broad strokes, finding two of SBA's challenges warranted but the remainder hollow.

SBA gets off on the right foot with its charge that the hours used in Plaintiffs' lodestar calculation overstate the time their attorneys actually spent on the litigation.  <u>See</u> Def. Opp. at 13–14.  As Plaintiffs' counsel now admits on Reply, while the news organizations were billed correct dollar amounts, uneven partitioning of fees among clients in May and June 2020 caused the firm's billing software to mistakenly exaggerate the time spent on particular tasks.  <u>See</u> Pl. Reply at 11; ECF No. 33-1 (Second Declaration of Charles D. Tobin), ¶¶ 5–7.  That error led to an inflated number of reported hours billed for each lawyer, which in turn "erroneously increased Plaintiffs' lodestar calculation."  Pl. Reply at 11.  Although the lack of internal divisions of time in many submitted billing entries prevents the Court from itself determining precisely by how much that figure erred, Plaintiffs report that the improperly included hours accounted for approximately 5.17% of their requested $154,648.27 in fees.  <u>See</u> Tobin 2d Decl., ¶ 8.  Having no reason to doubt that stated percentage, the Court will apply it to the new lodestar amount calculated using the USAO Matrix, thus leading to a deduction of $6,710.10 for a freshly revised award of $123,078.97.

Moving right along, the Court also agrees with SBA that Plaintiffs have overstated their hours — if only barely — for time spent reviewing information released by the agency during the litigation.  <u>See</u> Def. Opp. at 15–16.  While FOIA litigants "[g]enerally . . . should not recover

16

fees for time spent reviewing responsive documents," courts usually grant "some fees where document review is necessary to evaluate the sufficiency of production or to challenge withholdings."  Urban Air Initiative, 442 F. Supp. 3d at 324–25; see also Elec. Privacy Info. Ctr. v. FBI, 72 F. Supp. 3d 338, 351 (D.D.C. 2014) (finding it "reasonable" that "counsel reviewed the . . . documents the [agency] produced during this case to ensure the agency's compliance with FOIA").  Here, two months after Plaintiffs filed their Complaint, SBA released loan-level data for the millions of PPP loans made to that point.  WP I, 2020 WL 6504534, at *3.  As would have become apparent immediately upon opening one of the published spreadsheets, however, the release did not contain certain categories of Plaintiffs' requested information — namely, no one loan had both its dollar amount and the borrower's name and address.  Id.  While some review was no doubt necessary to determine how to proceed, the Court doubts that Plaintiffs' lawyers needed more than half an hour each to examine the agency's publication and readily determine what was missing.  At the risk of being accused of excessive flyspecking, then, it will shave 0.4 hours from Tobin's billings, as well as 1.7 hours from Mishkin's, thus reducing the attorney-fee award to $122,153.37.  See ECF No. 27-3 (Billing Sheets) at 169–70 (see entries dated 7/6/20, 7/7/20, and 7/24/20).

It is here that SBA's luck runs out, as its remaining objections fall on deaf ears.  Arguing that Plaintiffs seek "excessive fees" for time spent drafting their "rather discursive" Complaint and Amended Complaint, the agency asserts that FOIA pleadings are "usually very simple" and need only "allege that the FOIA request was submitted, and that the requirement of exhaustion does not apply."  Def. Opp. at 14.  Even putting that generalization to the side, however, this was not a "usual[]" FOIA case.  Id.  Rather, it involved eleven Plaintiffs and dozens of individual FOIA requests, which were tendered at different times and received varying treatment from

SBA.  See Pl. Reply at 12.  Given Plaintiffs' challenge to SBA's denials of expedited processing, moreover, they appropriately endeavored to plead detailed facts showing, as required by statute, a "compelling need" for the information and an "urgency to inform the public."  5 U.S.C. § 552(a)(6)(E)(v); see ECF No. 1 (Complaint), ¶¶ 12–33; ECF No. 5 (Amended Complaint), ¶¶ 18–40.  All of that made for a necessarily complex pair of submissions, far afield from the agency's two cited cases in which courts trimmed fee requests for excessive time spent drafting relatively cursory and uncomplicated FOIA complaints of seven and nine pages.  See Def. Opp. at 14–15 (citing Elec. Privacy Info. Ctr. v. FBI, 80 F. Supp. 3d 149, 158 (D.D.C. 2015), and Elec. Privacy Info. Ctr., 811 F. Supp. 2d at 238).  The Court is likewise mindful of the reality that time spent on research and writing at the complaint stage may well be "time saved" on such tasks at summary judgment.  See Pl. Reply at 13.

SBA's final series of objections can be disposed of with greater dispatch.  The agency takes issue with a handful of time entries listing assertedly "vague" tasks such as "coordination," along with several relatively minor instances of block billing.  See Def. Opp. at 16.  It likewise contends that Plaintiffs seek excessive fees for inadequately described internal conferences and discussions.  Id.  The Court, however, finds that the "vast majority" of billing entries are "appropriately detailed and allow [it] to discern 'with a high degree of certainty' the work for which [Plaintiffs are] requesting compensation."  Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 82 F. Supp. 3d 396, 412 (D.D.C. 2015) (quoting Role Models, 353 F.3d at 970); see also Coffey v. Bureau of Land Mgmt., 316 F. Supp. 3d 168, 171 (D.D.C. 2018) (rejecting challenge to block billing where relevant entries "deal[t] with minimal time periods . . . and typically conflate[d] but two tasks"); Elec. Privacy Info. Ctr., 999 F. Supp. 2d at 74 (finding that lawyers appropriately billed for internal conferences).  Even if a few entries could perhaps have

benefited from greater detail, the Court "declines . . . to engage in the kind of 'nitpicking' invited by" SBA's objections.  Am. Immigr. Council, 82 F. Supp. 3d at 411.

Finally, contrary to the agency's halfhearted insistence, see Def. Opp. at 16, Plaintiffs spent an appropriate amount of time reviewing materials from two other cases: one before this Court raising identical legal issues (No. 20-1614), and another in the Northern District of California seeking release of the same PPP data (No. 20-4619).  This Court consolidated the former suit with the present one for summary-judgment purposes, and although the NDCA action was ultimately stayed pending resolution of Plaintiffs' case, it easily could have been decided beforehand.  See Am. Small Bus. League v. Small Bus. Admin., No. 20-4619, ECF No. 35 (N.D. Cal. Oct. 26, 2020) (order staying case).  Indeed, as Plaintiffs point out, it likely "would have been unreasonable" for their lawyers not to have monitored and consulted with counsel in those related cases as their own litigation proceeded.  See Pl. Reply at 15.  The minimal time they spent to that effect, accordingly, is entirely appropriate.  See Elec. Privacy Info. Ctr., 72 F. Supp. 3d at 351 ("The proper statutory inquiry . . . is whether the fees requested were reasonably incurred in litigating the case.").  Last, as the Government offers no challenge to the costs Plaintiffs seek, the Court will award those.

## IV.  Conclusion

In sum, Plaintiffs sought a combined $154,841.92 in attorney fees and costs, and they will receive $122,347.02.  A separate Order so stating shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  January 21, 2021